**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; RASIER, LLC, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF SEATTLE; SEATTLE DEPARTMENT OF FINANCE AND ADMINISTRATIVE SERVICES; FRED PODESTA, in his official capacity as Director, Finance and Administrative Services, City of Seattle, *Defendants-Appellees.* | No. 17-35640 <br><br> D.C. No. 2:17-cv-00370-RSL <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted February 5, 2018
Seattle, Washington

Filed May 11, 2018

Before:  MILAN D. SMITH, JR. and MARY H.
MURGUIA, Circuit Judges, and EDUARDO C.
ROBRENO,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Antitrust / Labor Law

The panel affirmed in part and reversed in part the district court's dismissal of an action challenging, on federal antitrust and labor law grounds, a Seattle ordinance authorizing a collective-bargaining process between "driver coordinators"—like Uber Technologies; Lyft, Inc.; and Eastside for Hire, Inc. —and independent contractors who work as for-hire drivers.

The ordinance permits independent-contractor drivers, represented by an entity denominated an "exclusive driver representative," and driver coordinators to agree on the "nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers."

The panel reversed the district court's dismissal of claims that the ordinance violates, and is preempted by, § 1 of the Sherman Antitrust Act because the ordinance

[*] The Honorable Eduardo C. Robreno, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

sanctions price-fixing of ride-referral service fees by private cartels of independent-contractor drivers. The panel held that the state-action immunity doctrine did not exempt the ordinance from preemption by the Sherman Act because the State of Washington had not clearly articulated and affirmatively expressed a state policy authorizing private parties to price-fix the fees that for-hire drivers pay to companies like Uber or Lyft in exchange for ride-referral services. In addition, the active-supervision requirement for state-action immunity applied, and was not met.

The panel affirmed the district court's dismissal of claims that the ordinance was preempted by the National Labor Relations Act under either *Machinists* or *Garmon* preemption.

The panel remanded the case for further proceedings.

## COUNSEL

Michael A. Carvin (argued), Jacqueline M. Holmes, Christian G. Vergonis, and Robert Stander, Jones Day, Washington, D.C.; Lily Fu Claffee, Steven P. Lehotsky, and Warren Postman, U.S. Chamber Litigation Center, Washington, D.C.; Douglas C. Ross and Robert J. Maguire, Davis Wright Tremaine LLP, Seattle, Washington; Timothy J. O'Connell, Stoel Rives LLP, Seattle, Washington; for Plaintiffs-Appellants.

Stacey M. Leyton (argued), Stephen P. Berzon, and P. Casey Pitts, Altshuler Berzon LLP, San Francisco, California; Michael K. Ryan (argued), Sara O'Connor-Kriss, Josh Johnson, and Gregory C. Narver, Assistant City Attorneys;

Peter S. Holmes, Seattle City Attorney; City Attorney's Office, Seattle, Washington; for Defendants-Appellees.

Michele Arington (argued), Assistant Attorney General; Joel Marcus, Deputy General Counsel; David C. Shonka, Acting General Counsel; Federal Trade Commission, Washington, D.C.; Robert B. Nicholson and Steven J. Mintz, Attorneys; Andrew C. Finch, Principal Deputy Assistant Attorney General; Makan Delrahim, Assistant Attorney General; Antitrust Division, United States Department of Justice, Washington, D.C.; for Amici Curiae United States and Federal Trade Commission.

William R. Peterson and Allyson N. Ho, Morgan Lewis & Bockius LLP, Houston, Texas; Harry I. Johnson III, Morgan Lewis & Bockius LLP, Los Angeles, California; Stacey Anne Mahoney, Morgan Lewis & Bockius LLP, New York, New York; for Amici Curiae Coalition for a Democratic Workplace, National Federation of Independent Business Small Business Legal Center, and Consumer Technology Association.

Matthew J. Ginsburg and Harold Craig Becker, Washington, D.C., for Amici Curiae American Federation of Labor and Congress of Industrial Organizations.

Jonathan F. Mitchell, Stanford, California; Thomas R. McCarthy, Consovoy McCarthy Park PLLC, Arlington, Virginia; for Amici Curiae Antitrust Law Professors.

Alan D. Copsey, Deputy Solicitor General; Noah G. Purcell, Solicitor General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Amicus Curiae State of Washington.

Matthew J. Segal and Kymberly K. Evanson, Pacifica Law Group LLP, Seattle, Washington, for Amicus Curiae Professor Samuel Estreicher.

Rebecca Smith and Ceilidh Gao, National Employment Law Project—WA, Seattle, Washington, for Amici Curiae Los Angeles Alliance for a New Economy, National Domestic Worker Alliance, National Employment Law Project, Partnership for Working Families, and Puget Sound Sage.

Catherine L. Fisk, Berkeley, California; Charlotte Garden, Fred T. Korematsu Center for Law and Equality, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington; for Amici Curiae Labor Law Professors.

Sanjukta Paul, Detroit, Michigan, for Amici Curiae Law and Business Professors.

Barbara D. Underwood, Solicitor General; Anisha S. Dasgupta, Deputy Solicitor General; Seth M. Rokosky, Assistant Solicitor General of Counsel; Eric T. Schneiderman, Attorney General; Office of the Attorney General, New York, New York; Douglas S. Chin, Attorney General, Department of the Attorney General, Honolulu, Hawaii; Lisa Madigan, Attorney General, Office of the Attorney General, Chicago, Illinois; Thomas J. Miller, Attorney General, Office of the Attorney General, Des Moines, Iowa; Janet T. Mills, Attorney General, Office of the Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Attorney General's Office, Baltimore, Maryland; Maura Healey, Attorney General, Attorney General's Office, Boston, Massachusetts; Lori Swanson, Attorney General, Office of the Attorney General, St. Paul, Minnesota; Ellen F. Rosenblum, Attorney General, Office of

the Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Office of the Attorney General, Harrisburg, Pennsylvania; Peter F. Kilmartin, Attorney General, Office of the Attorney General, Providence, Rhode Island; Thomas J. Donovan, Jr., Attorney General, Office of the Attorney General, Montpelier, Vermont; Karl A. Racine, Attorney General, Office of the Attorney General, Washington, D.C.; for Amici Curiae the States of New York, Hawai'i, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Oregon, Pennsylvania, Rhode Island, and Vermont, and the District of Columbia.

## OPINION

M. SMITH, Circuit Judge:

On December 14, 2015, the Seattle City Council enacted into law Ordinance 124968, an Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers (Ordinance).[1]  The Ordinance was the first municipal ordinance of its kind in the United States, and authorizes a collective-bargaining process between "driver coordinators"—like Uber Technologies (Uber), Lyft, Inc. (Lyft), and Eastside for Hire, Inc. (Eastside)—and independent contractors who work as for-hire drivers. The Ordinance permits independent-contractor drivers, represented by an entity denominated an "exclusive driver representative," and driver coordinators to agree on the "nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers."  Seattle,

---

[1] The Ordinance amended section 6.310.110 of the Seattle Municipal Code, and added section 6.310.735 to the Code. *See* Seattle, Wash., Municipal Code §§ 6.310.110, 6.310.735.

Wash., Municipal Code § 6.310.735(H)(1).  This provision of the Ordinance is the crux of this case.

Acting on behalf of its members Uber, Lyft, and Eastside, Plaintiff-Appellant the Chamber of Commerce of the United States of America, together with Plaintiff-Appellant Rasier, LLC, a subsidiary of Uber (collectively, the Chamber), sued Defendants-Appellees the City of Seattle, the Seattle Department of Finance and Administrative Services (the Department), and the Department's Director, Fred Podesta (collectively, the City), challenging the Ordinance on federal antitrust and labor law grounds.  First, the Chamber asserts that the Ordinance violates, and is preempted by, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, because the Ordinance sanctions price-fixing of ride-referral service fees by private cartels of independent-contractor drivers.  Second, the Chamber claims that the Ordinance is preempted by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169, under *Machinists* and *Garmon* preemption.

The district court dismissed the case, holding that the state-action immunity doctrine exempts the Ordinance from preemption by the Sherman Act, and that the NLRA does not preempt the Ordinance.  The Chamber appealed both holdings.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  We reverse the district court's dismissal of the Chamber's federal antitrust claims, and remand the federal antitrust claims to the district court for further proceedings.  We also affirm the district court's dismissal of the Chamber's NLRA preemption claims.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Ride-Referral Companies

Eastside is the largest dispatcher of taxicab and for-hire vehicles in the Pacific Northwest.  Eastside provides licensed taxicab and for-hire vehicle drivers with dispatch, advertising, payment processing, and other administrative services, in exchange for a weekly fee, payable by drivers to Eastside.  Relying on advertising and a preexisting client base, Eastside generates transportation requests from passengers, who call, text-message, or email Eastside to request a ride.  Eastside then refers ride requests to drivers through a mobile data terminal.  If a passenger uses a credit card to pay a driver, Eastside processes the transaction and remits the payment to the driver.  The drivers who pay for Eastside's services are independent contractors—Eastside does not dictate how the drivers operate their transportation businesses.  For example, some drivers own licensed vehicles, whereas others lease them.

Uber and Lyft, founded in 2009 and 2012, respectively, have ushered ride-referral services into the digital age.  Uber and Lyft have developed proprietary smartphone applications (apps) that enable an online platform, or digital marketplace, for ride-referral services, often referred to as "ridesharing" services.  After downloading the Uber or Lyft app onto their smartphones, riders request rides through the app, which transmits ride requests to available drivers nearby.  Drivers are free to accept or ignore a ride request.  If a driver accepts a ride request, he or she is matched electronically with the rider, and then proceeds to the rider's location and fulfills the ride request.  If a driver ignores a ride request, the digital platform transmits the request to another nearby driver.  Drivers may cancel a ride request, even after initially accepting it, at any point prior to the

commencement of the ride.  Riders, too, may decide whether or not to accept a ride from any of the drivers contacted through the app.  After a ride is completed, riders pay drivers via the Uber or Lyft app, using a payment method, such as a credit card, placed on file with Uber or Lyft.

Uber and Lyft's business models have facilitated the rise of the so-called "gig economy."  In order to receive ride requests through the apps, drivers contract with, and pay a technology licensing fee to, Uber or Lyft.  These licensing fees are a percentage of riders' paid fares:  Uber and Lyft subtract their technology licensing fees from riders' payments, and remit the remainder to drivers.  Drivers' contractual agreements with either Uber or Lyft are not exclusive—in fact, many drivers use several ridesharing apps and even operate multiple apps simultaneously. Drivers may use the Uber and Lyft apps for however long and whenever they wish, if they wish to use them at all.

## B.  The Ordinance

On December 14, 2015, the Seattle City Council adopted Ordinance 124968.  The stated purpose of the Ordinance is to "allow[] taxicab, transportation network company, and for-hire vehicle drivers ('for-hire drivers') to modify specific agreements collectively with the entities that hire, direct, arrange, or manage their work," in order to "better ensure that [for-hire drivers] can perform their services in a safe, reliable, stable, cost-effective, and economically viable manner."  Seattle, Wash., Ordinance 124968, pmbl.

The Ordinance requires "driver coordinators" to bargain collectively with for-hire drivers.  *Id.* § 1(I).  A "driver coordinator" is defined as "an entity that hires, contracts with, or partners with for-hire drivers for the purpose of assisting them with, or facilitating them in, providing for-

hire services to the public."  Seattle, Wash., Municipal Code § 6.310.110.  The Ordinance applies only to drivers who contract with a driver coordinator "other than in the context of an employer-employee relationship"—in other words, the Ordinance applies only to independent contractors.  *Id.* § 6.310.735(D).

The collective-bargaining process begins with the election of a "qualified driver representative," or QDR.  *Id.* §§ 6.310.110, 6.310.735(C).  An entity seeking to represent for-hire drivers operating within Seattle first submits a request to the Director of Finance and Administrative Services (the Director) for approval to be a QDR.  *Id.* § 6.310.735(C).  Once approved by the City, the QDR must notify the driver coordinator of its intent to represent the driver coordinator's for-hire drivers.  *Id.* § 6.310.735(C)(2).

Upon receiving proper notice from the QDR, the driver coordinator must provide the QDR with the names, addresses, email addresses, and phone numbers of all "qualifying drivers."[2]  *Id.* § 6.310.735(D).  This disclosure requirement applies only to driver coordinators that have "hired, contracted with, partnered with, or maintained a contractual relationship or partnership with, 50 or more for-hire drivers in the 30 days prior to the commencement date" set by the Director.  *Id.*

The QDR then contacts the qualifying drivers to solicit their interest in being represented by the QDR.  *Id.* § 6.310.735(E).  Within 120 days of receiving the qualifying

---

[2] To be a qualifying driver, a for-hire driver must have "dr[iven] at least 52 trips originating or ending within the Seattle city limits for a particular Driver Coordinator during any three-month period in the 12 months preceding the commencement date."  Seattle, Wash., Qualifying Driver and Lists of Qualifying Drivers, Rule FHDR-1.

drivers' contact information, the QDR submits to the Director statements of interest from qualifying drivers indicating that they wish to be represented by the QDR in collective-bargaining negotiations with the driver coordinator. *Id.* § 6.310.735(F)(1). If a majority of qualifying drivers consent to representation by the QDR, the Director certifies the QDR as the "exclusive driver representative" (EDR) for all for-hire drivers for that particular driver coordinator.[3] *Id.* § 6.310.735(F)(2).

Once the Director certifies the EDR,

> the driver coordinator and the EDR shall meet and negotiate in good faith certain subjects to be specified in rules or regulations promulgated by the Director including, but not limited to, best practices regarding vehicle equipment standards; safe driving practices; the manner in which the driver coordinator will conduct criminal background checks of all prospective drivers; *the nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers*; minimum hours of work, conditions of work, and applicable rules.

*Id.* § 6.310.735(H)(1) (emphasis added).

---

[3] If more than one QDR is able to demonstrate that a majority of qualifying drivers wish to be represented by that QDR, the Director will designate the QDR with the largest number of statements of interest to be the EDR. Seattle, Wash., Municipal Code § 6.310.735(F)(2).

If an agreement is reached, the driver coordinator and the EDR submit the written agreement to the Director.  *Id.* § 6.310.735(H)(2).  The Director reviews the agreement for compliance with the Ordinance and Chapter 6.310 of the Seattle Municipal Code, which governs taxicabs and for-hire vehicles.  *Id.*  In conducting this review, the Director is to "ensure that the substance of the agreement promotes the provision of safe, reliable, and economical for-hire transportation services and otherwise advance[s] the public policy goals set forth in Chapter 6.310 and in the [Ordinance]."  *Id.*

The Director's review is not limited to the parties' submissions or the terms of the proposed agreement.  *Id.* Rather, the Director may gather and consider additional evidence, conduct public hearings, and request information from the EDR and the driver coordinator.  *Id.*

The agreement becomes final and binding on all parties if the Director finds the agreement compliant.  *Id.* § 6.310.735(H)(2)(a).  The agreement does not take effect until the Director makes such an affirmative determination. *Id.* § 6.310.735(H)(2)(c).  If the Director finds the agreement noncompliant, the Director remands it to the parties with a written explanation of the agreement's failures, and may offer recommendations for remedying the agreement's inadequacies.  *Id.* § 6.310.735(H)(2)(b).

If the driver coordinator and the EDR do not reach an agreement, "either party must submit to interest arbitration upon the request of the other," in accordance with the procedures and criteria specified in the Ordinance.  *Id.* § 6.310.735(I).   The interest arbitrator must propose an agreement compliant with Chapter 6.310 and in line with the City's public policy goals.  *Id.* § 6.310.735(I)(2).  The term

of an agreement proposed by the interest arbitrator may not exceed two years. *Id.*

The interest arbitrator submits the proposed agreement to the Director, who reviews the agreement for compliance with the Ordinance and Chapter 6.310, in the same manner the Director reviews an agreement proposed by the parties. *Id.* § 6.310.735(I)(3).

The parties may discuss additional terms and propose amendments to an approved agreement. *Id.* § 6.310.735(J). The parties must submit any proposed amendments to the Director for approval. *Id.* The Director has the authority to withdraw approval of an agreement during its term, if the Director finds that the agreement no longer complies with the Ordinance or furthers the City's public policy goals. *Id.* § 6.310.735(J)(1).

## C.  Procedural History

The Ordinance took effect on January 22, 2016.

The Chamber first filed suit challenging the Ordinance as preempted by the Sherman Act and the NLRA on March 3, 2016, but its suit was dismissed as unripe, because no entity had yet applied for QDR certification. *See Chamber of Commerce of the U.S. v. City of Seattle*, No. C16-0322RSL, 2016 WL 4595981, at *2, *4 (W.D. Wash. Aug. 9, 2016).

Subsequently, the Director designated Teamsters Local 117 (Local 117) as a QDR on March 3, 2017.  On March 7, 2017, Local 117 notified Uber, Lyft, Eastside, and nine other driver coordinators of its intent to serve as the EDR of all qualifying drivers who contract with those companies, and requested the qualifying drivers' contact information.

On March 9, 2017, the Chamber filed suit again, seeking a declaration that the Ordinance is unenforceable and a preliminary injunction enjoining the City from enforcing the Ordinance.[4]   Relevant to the present appeal,[5] the Chamber asserted two federal antitrust claims—a violation claim and a preemption claim.  Specifically, the Chamber claimed that the City violated section 1 of the Sherman Act by enacting and enforcing the Ordinance, and that the Ordinance conflicts with, and is preempted by, the Sherman Act.  The Chamber also asserted two federal labor preemption claims, challenging the Ordinance as preempted by the NLRA under *Machinists* and *Garmon* preemption.

On March 21, 2017, the City filed a motion to dismiss. On April 4, 2017, before ruling on the City's motion to dismiss, the district court granted the Chamber's motion for a preliminary injunction.[6]

---

[4] The Chamber filed an Amended Complaint adding Rasier as a co-plaintiff on April 11, 2017.  The Amended Complaint, which is otherwise largely identical in substance to the original Complaint, is the operative complaint in this case.

[5] The Chamber also asserted claims for violation of its members' federal rights under 42 U.S.C. § 1983, municipal action unauthorized by Washington law, violation of the Washington Consumer Protection Act, and violation of the Washington Public Records Act.  These claims are not addressed on appeal, because the Chamber did not raise them in its opening brief.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1137 n.13 (9th Cir. 2012) (stating that issues not raised in an opening brief are waived).

[6] The City appealed from the district court's order granting the Chamber's motion for a preliminary injunction in Case No. 17-35371. The City's appeal was voluntarily dismissed on September 6, 2017.

Although the district court granted the Chamber's motion for a preliminary injunction, it also granted the City's motion to dismiss on August 1, 2017, concluding that the state-action immunity doctrine exempted the Ordinance from preemption by the Sherman Act,[7] and that the Ordinance was not preempted by the NLRA.  The district court entered judgment on August 4, 2017.  The Chamber timely appealed on August 9, 2017.

On August 28, 2017, the Chamber filed an emergency motion for an injunction pending appeal in this court.  The City opposed the motion.  On September 8, 2017, we granted the Chamber's emergency motion and enjoined enforcement of the Ordinance pending this appeal.

## STANDARD OF REVIEW

We review the district court's grant of a motion to dismiss de novo.  *Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079, 1082 (9th Cir. 2010).

---

[7] The district court dismissed both of the Chamber's federal antitrust claims on the basis of state-action immunity.  Because the district court did not rule on the merits of the Chamber's antitrust violation claim, we do not address the merits of that claim here.

## ANALYSIS

### I. State-Action Immunity Does Not Protect the Ordinance from Preemption by Section 1 of the Sherman Act.

We turn first to the Chamber's federal antitrust claims, and hold that the Ordinance does not meet the requirements for state-action immunity.[8]

### A. Preemption

In determining whether the Sherman Act preempts a state or local law pursuant to the Supremacy Clause, we apply the principles of conflict preemption. "As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state [or local] regulatory schemes." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

A state or local law, "when considered in the abstract, may be condemned under the antitrust laws," and thus preempted, "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all

---

[8] Ordinarily, we would discuss first the threshold question of whether the Ordinance, which regulates labor relations between for-hire drivers and driver coordinators, is preempted wholly by federal labor law.

However, for purposes of this opinion, we discuss the Chamber's labor preemption claims last. The Chamber's NLRA preemption claims, in contrast to the Chamber's challenge to the district court's holding regarding state-action immunity, lack merit, and do not warrant reversal of the district court's order. As is evident from the Chamber's briefing and presentation at oral argument, the Chamber's federal antitrust claims, rather than its federal labor law claims, are the core of its appeal.

cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id.* at 661. "Such condemnation will follow under [section] 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation." *Id.* However, "[i]f the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract." *Id.* Unlike the categorical analysis under the per se rule of illegality, "[a]nalysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws." *Id.* In short, the Ordinance may be preempted facially by federal antitrust law if it authorizes a per se violation of section 1 of the Sherman Act, but not if it must be analyzed under the rule of reason.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Chief among such illegal arrangements are price-fixing agreements: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). "Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000) ("Foremost in the category of per se violations is horizontal price-fixing among competitors."). Put simply, "collusion" among competitors is "the supreme

evil of antitrust."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

Here, the district court assumed, without deciding, "that collusion between independent economic actors to set the prices they will accept for their services in the market is a per se antitrust violation."  On appeal, the City acknowledges that it "did not challenge the Chamber's contention that collective negotiations regarding topics such as payments to drivers could, absent *Parker* immunity, constitute per se antitrust violations."  Because the district court dismissed the Chamber's federal antitrust claims solely on the basis of state-action immunity, we limit our analysis to that issue.  We accept, without reaching the merits of the question, that the Ordinance authorizes a per se antitrust violation.  The parties may address on remand which mode of antitrust analysis—the per se rule of illegality or the rule of reason—applies.

## B.  The Requirements for State-Action Immunity

The state-action immunity doctrine derives from *Parker v. Brown*, 317 U.S. 341 (1943).  In *Parker*, the Supreme Court held that "because 'nothing in the language of the Sherman Act . . . or in its history' suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies, the Act should not be read to bar States from imposing market restraints 'as an act of government.'"  *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224 (2013) (quoting *Parker*, 317 U.S. at 350, 352).  Following *Parker*, the Supreme Court has, "under certain circumstances," extended immunity from federal

antitrust laws to "nonstate actors carrying out the State's regulatory program." *Id.* at 224–25.[9]

State-action immunity is the exception rather than the rule. Indeed, the Supreme Court has stressed that it is "disfavored": "[G]iven the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored, much as are repeals by implication.'" *Id.* at 225 (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)); *see id.* at 236 (reiterating "the principle that 'state-action immunity is disfavored'" (quoting *Ticor Title*, 504 U.S. at 636)). In line with its "preference" against state-action immunity, the Supreme Court "recognize[s] state-action immunity only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own.'" *Id.* at 225 (quoting *Ticor Title*, 504 U.S. at 635). The Supreme Court's narrow take on state-action immunity is all the more exacting when a non-state actor invokes the protective umbrella of *Parker* immunity: "'[C]loser analysis is required when the activity at issue is not directly that of' the State itself, but rather 'is carried out by others pursuant to state authorization.'" *Id.* (quoting *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)).

---

[9] The City's argument that the presumption against preemption applies here is misplaced. State-action immunity is a defense to preemption. *See, e.g.*, *Phoebe Putney*, 568 U.S. at 235 (referring to *Parker* immunity as a "state-action defense to price-fixing claims"). The City did not argue below that the Ordinance does not authorize a per se violation of section 1 of the Sherman Act. Accordingly, there is no challenge regarding the issue of whether preemption should or could apply. The only question is whether the *defense* to preemption applies.

The Supreme Court uses a two-part test, sometimes referred to as the *Midcal* test, to "determin[e] whether the anticompetitive acts of private parties are entitled to immunity." *Id.* First, "the challenged restraint [must] be one clearly articulated and affirmatively expressed as state policy," and second, "the policy [must] be actively supervised by the State." *Id.* (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)).

"Because municipalities and other political subdivisions are not themselves sovereign, state-action immunity under *Parker* does not apply to them directly." *Id.* As such, "immunity will only attach to the activities of local governmental entities if they are undertaken pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition." *Id.* at 226 (quoting *Cmty. Commc'ns Co. v. Boulder*, 455 U.S. 40, 52 (1982)). Local governmental entities, "unlike private parties, . . . are not subject to the 'active state supervision requirement' because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies." *Id.* (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46–47 (1985)). "Where state or municipal regulation by a private party is involved, however, active state supervision must be shown, even where a clearly articulated state policy exists." *Hallie*, 471 U.S. at 46 n.10.

### i.    The Clear-Articulation Test

We conclude that the anticompetitive restraint challenged in this case fails the first prong of the *Midcal* test. The State of Washington has not "clearly articulated and affirmatively expressed" a state policy authorizing private parties to price-fix the fees for-hire drivers pay to companies like Uber or Lyft in exchange for ride-referral services.

The clear-articulation test is met "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." *Phoebe Putney*, 568 U.S. at 226–27 (quoting *Hallie*, 471 U.S. at 42). "'[T]o pass the "clear articulation" test,' a state legislature need not 'expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects.'" *Id.* at 226 (alteration in original) (quoting *Hallie*, 471 U.S. at 43). To illustrate, the Supreme Court concluded in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), that "the clear-articulation test was satisfied because the suppression of competition in the billboard market was the foreseeable result of a state statute authorizing municipalities to adopt zoning ordinances regulating the construction of buildings and other structures." *Phoebe Putney*, 568 U.S. at 227.

Our inquiry with respect to the clear-articulation test is a precise one. "[T]he relevant question is whether the regulatory structure which has been adopted by the state has *specifically authorized the conduct* alleged to violate the Sherman Act." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 942 (9th Cir. 1996) (emphasis added). The state's authorization must be plain and clear: The relevant statutory provisions must "'plainly show' that the [state] legislature *contemplated* the sort of activity that is challenged," which occurs where they "confer 'express authority to take action that *foreseeably* will result in anticompetitive effects.'" *Hass v. Or. State Bar*, 883 F.2d 1453, 1457 (9th Cir. 1989) (first emphasis added) (quoting *Hallie*, 471 U.S. at 43–44). The state, in its sovereign capacity, must "clearly intend[] to displace competition in a particular field with a regulatory structure . . . in the relevant market." *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 64 (1985).

Once we determine that there is express state authorization, we then turn to the concept of foreseeability, which "is to be used in deciding the *reach* of antitrust immunity that stems from an *already authorized* monopoly, price regulation, or other disruption in economic competition." *Shames*, 626 F.3d at 1084 (second emphasis added).   A foreseeable result cannot circumvent the requirement that there be express authorization in the first place:   "[A] foreseeable result cannot *create* state authorization itself," but must itself stem from express authorization, which is "the necessary predicate for the Supreme Court's foreseeability test." *Id.* (quoting *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1997)).   We must be careful not to "appl[y] the concept of 'foreseeability' from [the] clear-articulation test too loosely." *Phoebe Putney*, 568 U.S. at 229.

Applying these principles to the Ordinance, we conclude that the clear-articulation requirement has not been satisfied. The state statutes relied upon by the City Council in enacting the Ordinance—Revised Code of Washington sections 46.72.001, 46.72.160, 81.72.200, and 81.72.210—do not "plainly show" that the Washington legislature "contemplated" allowing for-hire drivers to price-fix their compensation.   Nor is such an anticompetitive result foreseeable.

We examine the state statutes in turn.   First, Revised Code of Washington section 46.72.001 provides:

> The legislature finds and declares that privately operated for hire transportation service is a vital part of the transportation system within the state.   Consequently, the safety, reliability, and stability of privately operated for hire transportation services are

> matters of statewide importance. The regulation of privately operated for hire transportation services is thus an essential governmental function. Therefore, it is the intent of the legislature to permit political subdivisions of the state to regulate for hire transportation services without liability under federal antitrust laws.

*Id.*[10]

That the Washington state legislature "inten[ded] . . . to permit political subdivisions of the state to regulate for hire transportation services without liability under federal antitrust laws," *id.*, is insufficient to bring the Ordinance within the protective ambit of state-action immunity. We are mindful of the Supreme Court's instruction that "a State may not confer antitrust immunity on private persons by fiat," *Ticor Title*, 504 U.S. at 633, and that a "State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful," *Hallie*, 471 U.S. at 39. Rather, it must first meet the *Midcal* requirements: A state "may displace competition with active state supervision [only] if the displacement is both intended by the State and implemented in its specific details."[11] *Ticor Title*, 504 U.S.

---

[10] We will not separately analyze Revised Code of Washington section 81.72.200, which uses substantially similar language as section 46.72.001.

[11] The City cites *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978), for the proposition that "a specific, detailed legislative authorization" is not required. *Id.* at 415 (plurality opinion). However, in the same decision, the Supreme Court stated that "an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the

at 633.    We may not "defer[]to private pricefixing arrangements under the general auspices of state law," but instead must ensure that the "precondition[s] for immunity from federal law," such as "[a]ctual state involvement," are met.  *Id.*  After all, "[i]mmunity is conferred out of respect for ongoing regulation by the State, not out of respect for the economics of price restraint."  *Id.*

The plain language of the statute centers on the provision of "privately operated for hire transportation services," Wash. Rev. Code § 46.72.001, not the contractual payment arrangements between for-hire drivers and driver coordinators for use of the latter's smartphone apps or ride-referral services.  Although driver coordinators like Uber and Lyft contract with providers of transportation services, they do not fulfill the requests for transportation services— the drivers do.  Nothing in the statute evinces a clearly articulated state policy to displace competition in the market for ride-referral service fees charged by companies like Uber, Lyft, and Eastside.  In other words, although the statute addresses the provision of transportation services, it is silent on the issue of compensation contracts between for-hire drivers and driver coordinators.  To read into the plain text of the statute *implicit* state authorization and intent to displace competition with respect to for-hire drivers' compensation would be to apply the clear-articulation test "too loosely."  *Phoebe Putney*, 568 U.S. at 229.

---

authority given a governmental entity to operate *in a particular area*, that the legislature *contemplated the kind of action complained of*.'"  *Id.* (emphase added) (quoting *City of Lafayette v. La. Power & Light Co.*, 532 F.2d 431, 434 (5th Cir. 1976)).  As explained above, the City has not shown that the Washington legislature contemplated the kind of anticompetitive restraint established by the Ordinance.

Revised Code of Washington section 46.72.160 also lends no support to the City's position.  The statute, which focuses on the regulation of for-hire vehicle services, provides that "[c]ities . . . may license, control, and regulate all for hire *vehicles* operating within their respective jurisdictions."    Wash. Rev. Code § 46.72.160 (emphasis added).  Each enumerated example of regulatory power in section 46.72.160 plainly indicates legislative concern with the provision of vehicular services:

The power to regulate includes:

(1) Regulating entry into the business of providing for hire vehicle transportation services;

(2) Requiring a license to be purchased as a condition of *operating a for hire vehicle* and the right to revoke, cancel, or refuse to reissue a license for failure to comply with regulatory requirements;

(3) Controlling the rates charged for *providing for hire vehicle transportation service* and the manner in which rates are calculated and collected;

(4) Regulating the *routes and operations of for hire vehicles*, including restricting access to airports;

(5) Establishing safety and equipment requirements; and

(6) Any other requirements adopted to ensure
safe   and   reliable   *for   hire   vehicle
transportation service*.

*Id.* (emphases added).[12]    These enumerated powers refer
specifically to for-hire vehicles, which by definition are
"vehicles used for the transportation of passengers for
compensation."  Wash. Rev. Code § 46.72.010(1).  None of
the powers confer upon the City the authority to regulate the
fees Uber, Lyft, and Eastside charge in exchange for use of
their smartphone apps or ride-referral services.  Even the
power to regulate "the rates charged for providing for hire
vehicle transportation service"—the closest analog to the
challenged Ordinance provision—speaks to rates charged to
passengers in exchange for the *provision* of transportation
services, not the fees Uber and Lyft charge to drivers for use
of their apps.  And the sixth enumerated power—a residual
power—addresses   "for   hire   vehicle   transportation
service[s]," not ride-referral service fees.

Our case law also forecloses the City's broad reading of
the Washington statutes.    In *Medic Air Corp. v. Air
Ambulance Authority*, we distinguished between the market
for air ambulance *services* and the market for *dispatching* air
ambulances in the course of applying the clear-articulation
test.  843 F.2d 1187, 1189–90 (9th Cir. 1988).  We held that
"a county board of health had clearly intended to displace
competition by establishing a monopoly in the market of
dispatching air ambulances in the county, and that state
action immunity therefore shielded this monopoly."
*Shames*, 626 F.3d at 1084 (citing *Medic Air*, 843 F.2d at

---

[12] We will not separately analyze Revised Code of Washington
section 81.72.210, which uses substantially similar language as section
46.72.160.

1189).   However, we declined to extend the scope of that immunity, holding that "this immunity did *not* reach anticompetitive conduct in the ambulance *service* market, because this was 'not a "necessary or reasonable consequence" of the decision to establish an exclusive *dispatcher*.'"   *Id.* (quoting *Medic Air*, 843 F.2d at 1189). Here, too, there is a critical distinction between transportation services by for-hire drivers and ride-referral services by companies like Uber and Lyft.   We cannot collapse the market for ride-referral services into the market for transportation services without colliding with our case law.

Furthermore, the Supreme Court has discouraged extending state-action immunity indiscriminately, in line with the "principle that 'state-action immunity is disfavored.'"   *Phoebe Putney*, 568 U.S. at 236 (quoting *Ticor Title*, 504 U.S. at 636).   "[R]egulation of an industry, and even the authorization of discrete forms of anticompetitive conduct pursuant to a regulatory structure, does not establish that the State has affirmatively contemplated other forms of anticompetitive conduct that are only tangentially related."   *Id.* at 235.   To illustrate, the Supreme Court held in *Phoebe Putney* that a state law vesting a local governmental entity with general corporate powers and allowing it to acquire hospitals "d[id] not clearly articulate and affirmatively express a state policy empowering the [entity] to make acquisitions of existing hospitals that w[ould] substantially lessen competition."   *Id.* at 228.

The Supreme Court has consistently demonstrated reluctance to careen beyond the bounds of state authorization in its application of the clear-articulation test.   We must follow suit.   In *Goldfarb v. Virginia State Bar*, 421 U.S. 773

(1975), the Supreme Court "rejected a state-action defense to price-fixing claims where a state bar adopted a compulsory minimum fee schedule. Although the State heavily regulated the practice of law, [the Supreme Court] found no evidence that it had adopted a policy to displace price competition among lawyers." *Phoebe Putney*, 568 U.S. at 235 (citing *Goldfarb*, 421 U.S. at 788–92). Here, although the State of Washington authorized municipalities to regulate the for-hire transportation services industry at large, the statutes do not indicate that the state adopted a policy authorizing for-hire drivers to fix the rates Uber and Lyft charge for use of their ride-referral apps.

Similarly, in *Cantor v. Detroit Edison Co.*, 428 U.S. 579 (1976), the Supreme Court "concluded that a state commission's regulation of rates for electricity charged by a public utility did not confer state-action immunity for a claim that the utility's free distribution of light bulbs restrained trade in the light-bulb market." *Phoebe Putney*, 568 U.S. at 235 (citing *Cantor*, 428 U.S. at 596); *see Cantor*, 428 U.S. at 584 (observing that "[t]he statute creating the Commission contains no direct reference to light bulbs"). The regulation of rates in one area—i.e., the regulation of rates charged to passengers for transportation services— does not confer the shield of state-action immunity onto anticompetitive conduct in a related market—i.e., price-fixing the fees for-hire drivers pay to Uber and Lyft in order to use their digital platforms.

In cases in which the Supreme Court found the clear-articulation test to be satisfied, the initial state authorization clearly contemplated and plainly encompassed the

challenged anticompetitive conduct.[13]    For example, in *Omni*, "where the respondents alleged that the city had used its zoning power to protect an incumbent billboard provider against competition, [the Supreme Court] found that the clear-articulation test was easily satisfied," as the suppression of competition in the billboard market stemmed clearly and directly from state statutes delegating authority to cities to adopt zoning ordinances regulating buildings and other structures. *Phoebe Putney*, 568 U.S. at 230.  Indeed, the Court explained that "'[t]he very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition' and that a zoning ordinance regulating the size, location, and spacing of billboards 'necessarily protects existing billboards against some competition from newcomers.'"    *Id.* (alteration in original) (quoting *Omni*,

---

[13] The City's selective reading of the Supreme Court's decision in *North Carolina State Board of Dental Examiners v. FTC*, 135 S. Ct. 1101 (2015), does not buttress its position.  The Supreme Court observed only that the clear-articulation test, on its own, is insufficient to justify state-action immunity:

> The two requirements set forth in *Midcal* provide a proper analytical framework to resolve the ultimate question whether an anticompetitive policy is indeed the policy of a State.  The first requirement—clear articulation—rarely will achieve that goal by itself, for a policy may satisfy this test yet still be defined at so high a level of generality as to leave open critical questions about how and to what extent the market should be regulated.

*Id.* at 1112.  In so stating, the Supreme Court made a noncontroversial point:  The fact that a state may have clearly articulated a policy, and thus satisfied the first *Midcal* requirement, does not answer key questions about the implementation of the policy—questions which are addressed by the second *Midcal* requirement of active state supervision.

499 U.S. at 373).  Unlike the zoning statutes in *Omni*, which authorized the regulation of buildings and structures, the Washington statutes in this case authorize regulation of the provision of transportation services to passengers—they do not encompass regulation of the payment contracts between for-hire drivers and ride-referral services.

Similarly, in *Southern Motor Carriers*, the Supreme Court concluded that the clear-articulation test was readily satisfied where four state public service commissions decided to permit collective ratemaking by common carriers for intrastate transportation of general commodities. 471 U.S. at 62–66.  Three of the four states had "statutes that explicitly permit collective ratemaking by common carriers," the exact anticompetitive conduct in the precise market at issue.  *Id.* at 63.  Mississippi, the fourth state, had a statute authorizing the state public service commission not only to regulate common carriers, but also to "prescribe 'just and reasonable' rates for the intrastate transportation of general commodities." *Id.* (quoting Miss. Code § 77-7-221). Although Mississippi's statute did not flesh out "[t]he details of the inherently anticompetitive rate-setting process," the statute expressly indicated the state's intention to displace market competition in rate-setting for intrastate transportation of general commodities, the very market at issue.  *Id.* at 64.  The present case is clearly distinguishable from *Southern Motor Carriers*.  Here, there is no state statute expressly authorizing private parties to price-fix the fees for-hire drivers pay for use of Uber, Lyft, and Eastside's ride-referral services.

Tellingly, Uber and Lyft did not exist when the Washington statutes were enacted.[14]  The very concept of digital ridesharing services was probably well beyond the imaginations of lawmakers two to three decades ago, much less foreseeable.  But the fact that technology has advanced leaps and bounds beyond the contemplation of the state legislature is not, on its own, the dispositive factor in our holding today.  Digital platforms like Uber and Lyft have become "highly interconnected with modern economic and social life," *Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018), and present novel challenges and contexts for regulation.  Nevertheless, it is not our role to make policy judgments properly left to the Washington state legislature.  Instead, we must tread carefully in the area of state-action immunity, lest "a broad interpretation of the doctrine . . . inadvertently extend immunity to anticompetitive activity which the states did not intend to sanction," or "a broad application of the doctrine . . . impede states' freedom by threatening to hold them accountable for private activity they do not condone 'whenever they enter the realm of economic regulation.'"  *Cost Mgmt. Servs.*, 99 F.3d at 941 (quoting *Ticor Title*, 504 U.S. at 635–36).

Applying governing law, we hold that the clear-articulation requirement for state-action immunity is not satisfied in this case.

---

[14] Revised Code of Washington sections 46.72.001 and 46.72.160 were enacted in 1996.  Revised Code of Washington sections 81.72.200 and 81.72.210 were enacted in 1984.

## ii.   The Active-Supervision Requirement

We next hold that the Ordinance does not meet the active-supervision requirement for *Parker* immunity.

"The active supervision requirement demands . . . 'that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy.'" *N.C. State Bd. of Dental Examiners v. FTC*, 135 S. Ct. 1101, 1112 (2015) (quoting *Patrick v. Burget*, 486 U.S. 94, 101 (1988)). Because "[e]ntities purporting to act under state authority might diverge from the State's considered definition of the public good" and "[t]he resulting asymmetry between a state policy and its implementation can invite private self-dealing," the active-supervision requirement "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity." *Id.*

As a threshold matter, we first clarify that the active-supervision requirement applies to this case.  It is settled law that "active state supervision is not a prerequisite to exemption from the antitrust laws where the actor is a municipality rather than a private party." *Hallie*, 471 U.S. at 47.  However, where, as here, "state or municipal regulation by a private party is involved, . . . active state supervision must be shown, even where a clearly articulated state policy exists." *Id.* at 46 n.10 (citing *S. Motor Carriers*, 471 U.S. at 62).

*Southern Motor Carriers* is illustrative.   That case involved a collective ratemaking scenario similar to the one authorized by the Ordinance in the present case.  In *Southern Motor Carriers*, four states permitted private rate bureaus, composed of common carriers, to submit rate proposals to

their respective state public service commissions for approval or rejection. *See* 471 U.S. at 50–52. The states authorized, but did not compel, the common carriers to agree on the rate proposals prior to submission to the state agency. *See id.* A proposed rate could become effective in two circumstances—if the state agency took no action within a specified period of time, or, if a hearing was scheduled, only after affirmative agency approval. *See id.* Although the state public service commissions "ha[d] and exercise[d] ultimate authority and control over all intrastate rates," *id.* at 51, the requirement of active state supervision still applied, due to the involvement of the private rate bureaus and common carriers in the ratemaking process, *see id.* at 66.[15] Likewise here, private parties—for-hire drivers and driver coordinators—are permitted to set rates collectively and submit them to the Director for approval. Accordingly, the active-supervision requirement applies.

The involvement of private parties in municipal regulation renders this case ineligible for the municipality exception outlined in *Hallie*: "*Hallie* explained that '[w]here the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals.'" *Dental Examiners*, 135 S. Ct. at 1112 (alteration in original) (quoting *Hallie*, 471 U.S. at 47); *see Phoebe Putney*, 568 U.S. at 226 (noting that the municipality exception is designed to "preserve[] to the States their freedom . . . to use their municipalities to administer state

---

[15] The Supreme Court found that "[t]he second prong of the *Midcal* test [was] met, for the Government ha[d] conceded that the relevant States, through their agencies, actively supervise[d] the conduct of private parties." *S. Motor Carriers*, 471 U.S. at 66.

regulatory policies free of the inhibitions of the federal antitrust laws without at the same time permitting purely parochial interests to disrupt the Nation's free-market goals" (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 415–16 (1978) (plurality opinion)).   In contrast, this case presents a scenario in which the City authorizes collective price-fixing by private parties, which the Director evaluates and ratifies.  The amount of discretion the Ordinance confers upon private actors is far from trivial.[16]

Having decided that the active-supervision requirement applies to this case, we turn to examine whether it is met. Clearly, it is not.   It is undisputed that the State of Washington plays no role in supervising or enforcing the terms of the City's Ordinance.

---

[16] "A regulation is a unilateral restraint when '[n]o further action is necessary by the private parties because the anticompetitive nature of [the] restraint is complete upon enactment.'"   *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 927 (9th Cir. 2011) (alterations in original) (quoting *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 890 (9th Cir. 2008)).  There, "no degree of discretion [is] delegated to private actors."  *Id.* (quoting *Costco*, 522 F.3d at 890).  In contrast, "[t]he 'hallmark' of a hybrid restraint is the '*delegation* of discretion to private actors.'"  *Id.* (quoting *Costco*, 522 F.3d at 898 n.20). "The key distinction is that the regulation leaves a gap in the restraint of trade for private parties to fill at their discretion."  *Id.*

Here, the anticompetitive restraint turns on the discretion of private actors, as the EDR and the driver coordinator agree on set prices, which they subsequently submit to the Director for review.  We have held a similar anticompetitive restraint was a hybrid restraint:  Where "the regulation[] . . . ha[d] the effect of delegating to private parties the discretion to set the posted price to be held," it was "an anticompetitive arrangement they could not achieve legally by explicit agreement."  *Id.* at 930.

The City cites no controlling authority to support its argument that the Supreme Court uses the word "State" simply "as shorthand for the State and all its agents, including municipalities." The Supreme Court has stated repeatedly that active supervision must be "by the State itself." *Midcal*, 445 U.S. at 105; *see Dental Examiners*, 135 S. Ct. at 1110 (stating that the policy must be "actively supervised by the State" (quoting *Phoebe Putney*, 568 U.S. at 224)), 1112 (explaining that active-supervision "requir[es] the State to review and approve interstitial policies made by the entity claiming immunity"); *Ticor Title*, 504 U.S. at 633 ("[T]he policy must be actively supervised by the State itself." (quoting *Midcal*, 445 U.S. at 105)); *Patrick*, 486 U.S. at 101 ("[T]he active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct.").

We take it as a given that the Supreme Court means what it states. In *Hallie*, the Supreme Court stated that "[w]here state or municipal regulation by a private party is involved, however, active state supervision must be shown."[17] 471 U.S. at 46 n.10. In the first clause, the Supreme Court used "state or municipal," thus drawing a disjunctive difference between the two words. In the second clause, it used only "state." It is highly improbable that the Supreme Court chose to distinguish between states and municipalities in the beginning of the sentence, only to conflate the two in the latter part of the sentence.

---

[17] The City's citation to *Tom Hudson & Associates, Inc. v. City of Chula Vista*, 746 F.2d 1370 (9th Cir. 1984), does not persuade us otherwise. The case pre-dates *Hallie*, and the question of whether municipal supervision could satisfy the active-supervision requirement was not at issue. *See id.* at 1374.

Moreover, the City's interpretation of the Supreme Court's use of "State" collapses the specific distinction the Supreme Court has drawn between cities, which are not sovereign entities, and states, which are.  Sovereign capacity matters.  Indeed, the very origins of *Parker* immunity stem from respect for the states' sovereign capacity to regulate their economies.  *Phoebe Putney*, 568 U.S. at 224; *see Dental Examiners*, 135 S. Ct. at 1112 (noting that the active-supervision requirement serves to "determin[e] whether anticompetitive policies and conduct are indeed the action of a State in its sovereign capacity").  A "substate governmental entity" is simply not equivalent to a state:  "Because municipalities and other political subdivisions are not themselves sovereign, state-action immunity under *Parker* does not apply to them directly."  *Phoebe Putney*, 568 U.S. at 225.  Unlike a state, a municipality may invoke the protective cloak of *Parker* immunity under "the narrow exception *Hallie* identified" not because it is sovereign, but because there is "little or no danger that it is involved in a private price-fixing arrangement"; the fact that "municipalities are electorally accountable and lack the kind of private incentives characteristic of active participants in the market"; and the "substantially reduc[ed] . . . risk that [a municipality] would pursue private interests while regulating any single field."  *Dental Examiners*, 135 S. Ct. at 1112–13 (quoting *Hallie*, 471 U.S. at 47).  All of the reasons justifying the *Hallie* exception are eviscerated by the involvement of private parties in this case.

In concluding that the active-supervision requirement is not satisfied in this case, we do not disturb *Hallie*'s well-settled rule that municipal actors need not meet the active-supervision requirement.  *See Hallie*, 471 U.S. at 47.  Rather, following *Hallie*, we hold that in this case, in which private actors exercise substantial discretion in setting the terms of

municipal regulation, "active state supervision must be shown." *Id.* at 46 n.10.  Because the distinction between states and municipalities is of crucial importance for purposes of state-action immunity, we reject the City's invitation to treat the two entities interchangeably.[18]

## II.  The Ordinance Is Not Preempted by the National Labor Relations Act.

We next hold that the Ordinance is not preempted by the NLRA under either *Machinists* or *Garmon* preemption.

"Although the NLRA itself contains no express pre-emption provision, [the Supreme Court] ha[s] held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy." *Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60, 65 (2008). Both are forms of implied preemption:  The first is *Machinists* preemption, named after the Court's decision in *Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976).  *Machinists* preemption "forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended 'be unregulated because left "to be controlled by the free play of economic forces."'" *Chamber of Commerce*, 554 U.S. at 65 (quoting *Machinists*, 427 U.S. at 140).  *Machinists* preemption stems from "the premise that '"Congress struck a balance of protection, prohibition, and laissez-faire in respect to union

---

[18] Because we conclude that the State of Washington, rather than the City, must carry out the active-supervision requirement, we do not reach the Chamber's alternative argument that even if municipal supervision could satisfy the active-supervision requirement, the supervision is "insufficiently active."

organization, collective bargaining, and labor disputes.""" *Id.* (quoting *Machinists*, 427 U.S. at 140 n.4).

The second is *Garmon* preemption, named after the Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). *Garmon* preemption "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Chamber of Commerce*, 554 U.S. at 65 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986)). "To this end, *Garmon* pre-emption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Id.* (quoting *Wis. Dep't. of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986)).

## A. *Machinists* Preemption

The Chamber first contends that the Ordinance is preempted by the NLRA under a theory of *Machinists* preemption because the Ordinance regulates economic activity that Congress intended to remain unregulated and left to the forces of the free market. The Chamber argues that Congress's choice to exclude independent contractors from the NLRA's definition of "employee" in 29 U.S.C. § 152(3) implicitly preempts local labor regulation of independent contractors. We disagree.

We begin by recounting briefly the history of the NLRA's definition of "employee." In 1935, Congress defined "employee" in the NLRA as follows:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless

> this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse.

National Labor Relations Act, Pub. L. No. 198, § 2, 49 Stat. 449, 450 (1935) (amended 1947).

About a decade later, the Supreme Court decided *NLRB v. Hearst Publications*, 322 U.S. 111 (1944), in which it held that "[w]hether . . . the term 'employee' includes [particular] workers . . . must be answered primarily from the history, terms and purposes of the legislation." *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968) (second alteration in original) (quoting *Hearst*, 322 U.S. at 124). In effect, the *Hearst* Court held that "the standard" for determining whether a particular worker was an employee within meaning of the NLRA was not one based exclusively on common-law agency principles, but rather "was one of economic and policy considerations within the labor field." *Id.* Applying this new standard, the Supreme Court concluded that although newsboys were independent contractors, they were employees within the meaning of the NLRA. *See Hearst*, 322 U.S. at 131–32.

The Supreme Court's ruling in *Hearst* triggered swift Congressional condemnation. *See United Ins.*, 390 U.S. at

256.  In 1947, Congress enacted the Labor Management Relations Act, also known as the Taft-Hartley Act.  Relevant to this case, the Taft-Hartley Act amended the definition of "employee" in the NLRA by specifically excluding independent contractors, as well as supervisors and individuals subject to the Railway Labor Act.  *See* Labor-Management Relations Act, ch. 120, sec. 101, § 2(3), 61 Stat. 136, 137–38 (1947).   The new definition of "employee," which is still operative today, provides:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, *or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined*.

*Id.* (emphasis added); *see* 29 U.S.C. § 152(3).

As the Supreme Court subsequently observed:   "The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act."   *United Ins.*, 390 U.S. at 256. The legislative history of the amendment corroborates this observation.   The House Report for the amendment explained:

> An "employee," according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire.  But in the case of [*NLRB v. Hearst Publications*, 322 U.S. 111 (1944)], the Board expanded the definition of the term "employee" beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic "expertness" of the Board, upheld the Board.  In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be "employees". [sic]  The people the merchants hired to sell the papers were "employees" of the merchants, but holding the merchants to be "employees" of the publisher of the papers was most far reaching.  It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up.  In the law, there

always has been a difference, and a big difference, between "employees" and "independent contractors". [sic] "Employees" work for wages or salaries under direct supervision. "Independent contractors undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not far-fetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes "independent contractors" from the definition of "employee". [sic]

H.R. Rep. No. 80-245, at 18 (1947).

Citing the House Report, the Chamber asserts that Congress excluded independent contractors from the NLRA's definition of "employee" in order to leave independent-contractor arrangements to the free play of economic forces, rather than subject to collective bargaining, federal or local. However, the portion of the House Report the Chamber relies upon actually refers to *supervisors*, not independent contractors. *See id.* at 16–17 (noting that

*supervisors* have "abandoned the 'collective security' of the rank and file voluntarily, because they believed the opportunities thus opened to them to be more valuable to them than such 'security'").

The House Report's discussion of the exclusion of independent contractors shows that Congress intended to effect a return to the status quo, rather than preempt state or local regulation of independent contractors.  Congress added the exclusion in order to reject the Supreme Court's erroneous "new" construction of "employee" and to return to the common-law definition of "employee" that was in place nine years earlier, before *Hearst*.  *Id.* at 18.  While the Chamber makes much of Congress's exclusion of independent contractors from the definition of "employee," the legislative history does not support the Chamber's claim.

Furthermore, the fact that a group of workers is excluded from the definition of "employee" in § 152(3), without more, does not compel a finding of *Machinists* preemption.  As the Chamber acknowledges, § 152(2)–(3) excludes agricultural laborers, domestic workers, and public employees, all of which have been subject to state regulation.  *E.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181 (2007) ("The National Labor Relations Act leaves States free to regulate their labor relationships with their public employees."); *Greene v. Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2015) ("Although Congress exempted domestic service workers from the NLRA, Congress did not demonstrate an intent to shield these workers from all regulation.").  Indeed, we concluded with respect to the exclusion of agricultural laborers from § 152(3):

> [W]here, as here, Congress has chosen not to create a national labor policy in a particular field, the states remain free to legislate as

they see fit, and may apply their own views of proper public policy to the collective bargaining process insofar as it is subject to their jurisdiction.  We find nothing in the National Labor Relations Act to suggest that Congress intended to preempt such state action by legislating for the entire field. Indeed, we draw precisely the opposite inference from Congress's exclusion of agricultural employees from the Act.

*United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982).  We find no reason to treat independent contractors differently than these other excluded categories of workers.

Finally, the Chamber's reliance on *Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653 (1974), is misplaced. In *Beasley*, the Supreme Court considered whether the exclusion of supervisors from the NLRA's definition of "employee," which "freed employers to discharge supervisors without violating the [NLRA's] restraints against discharges on account of labor union membership," "also freed the employer from liability in damages to the discharged supervisors" under a state law "that provide[d] such an action for employees discharged for union membership."  *Id.* at 654–55.  The Supreme Court held that section 14(a) of the NLRA contained an express statement of preemption that precluded employers from treating supervisors as employees.[19]  *Id.* at 657–62.  In so holding,

---

[19] Section 14(a) of the NLRA, 29 U.S.C. § 164(a), contains an express statement of preemption:

the Supreme Court did not rely on any theory of implicit preemption.  Needless to say, there is no analogous express statement of preemption like section 14(a) for independent contractors.

The Supreme Court also concluded in *Beasley* that the legislative history behind the supervisor exclusion "compels the conclusion that Congress' dominant purpose in amending [NLRA sections] 2(3) and 2(11), and enacting [NLRA section] 14(a) was to redress a perceived imbalance in labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposed interests."  *Id.* at 661–62.  These legislative concerns do not apply to independent contractors.  In sum, *Beasley* is inapposite and lends no support for the Chamber's claim.

Neither case law nor legislative history supports the Chamber's argument that Congress's choice to exclude supervisors from the definition of "employee" in § 152(3), on its own, has implicit preemptive effect.  We thus reject the Chamber's claim that the Ordinance is preempted under a theory of *Machinists* preemption.

---

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

*Id.*

### B.  *Garmon* **Preemption**

Lastly, the Chamber argues that the Ordinance is preempted by the NLRA under a theory of *Garmon* preemption because the Ordinance "requires local officials and state courts to decide whether for-hire drivers are employees under the NLRA," a determination which the Chamber contends is within the exclusive jurisdiction of the NLRB.  We find this argument unpersuasive.

To start, the Ordinance expressly disclaims any such determination:

> No provision of this ordinance shall be construed as . . . providing any determination regarding the legal status of taxicab, transportation network company, and for-hire vehicle drivers as employees or independent contractors.  The provisions of this ordinance do not apply to drivers who are employees under 29 U.S.C. § 152(3).

Seattle, Wash., Ordinance 124968 § 6.

Moreover, the Chamber fails to meet the threshold requirement for a *Garmon* preemption claim.  It is a "precondition for [*Garmon*] pre-emption[] that the conduct [at issue] be 'arguably' protected or prohibited."  *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 394 (1986).  This precondition "is not satisfied by a conclusory assertion of pre-emption."  *Id.*  "If the word 'arguably' is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor."  *Id.* at 395.  In other words, "a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its

language and that has not been 'authoritatively rejected' by the courts or the Board." *Id.* (quoting *Marine Eng'rs Beneficial Ass'n v. Interlake S.S. Co.*, 370 U.S. 173, 184 (1962)). Next, the party must "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Id.* In short, "a party asserting pre-emption must put forth enough evidence to enable a court to conclude that the activity is arguably subject to the Act." *Id.* at 398.

The facts of *Davis* are illustrative. In *Davis*, there was a dispute over whether an individual was a supervisor—in which case there would be no preemption—or an employee—in which case there would be preemption, and the NLRB, rather than the state court, would have proper jurisdiction over the matter. *Id.* at 394. The union in that case "point[ed] to no evidence in support of its assertion that [the individual] was arguably an employee." *Id.* at 398. "Its sole submission [was] that [the individual] was arguably an employee because the Board ha[d] not decided that he was a supervisor." *Id.* at 396. This was insufficient to meet the union's "burden of showing at least an arguable case before the jurisdiction of a state court w[ould] be ousted." *Id.*

Like the union in *Davis*, the Chamber, without citing any authority, asserts that "there is no need for the Chamber to take a position on the employment status of for-hire drivers, and there is no need for the Chamber to provide any supporting evidence." Instead, the Chamber lists, without elaboration, ongoing matters pending before the NLRB on the question of whether drivers who use ride-referral services are employees. As the party asserting preemption, the Chamber has not met its burden to show at least an arguable case that the drivers at issue are covered by the NLRA. Practically speaking, the question of whether drivers

who contract with Uber and Lyft are employees or independent contractors may well be a "live issue" in other judicial and administrative proceedings involving different parties, claims, and law.  But that does not absolve the Chamber from complying with our case law regarding *Garmon* preemption.

The Chamber asserts the alternative argument that, "[a]t a minimum, the Ordinance is preempted under *Garmon* until the NLRB conclusively determines whether the for-hire drivers who use Uber, Lyft, and Eastside are employees or independent contractors."  This argument, too, is futile.  As the Supreme Court stated in *Davis*, "Nothing in *Garmon* suggests that an arguable case for pre-emption is made out simply because the Board has not decided the general issue one way or the other."  *Id.* at 397.

The Chamber has not made any showing or set forth any evidence showing that the for-hire drivers covered by the Ordinance are arguably employees subject to the NLRA. We thus hold that the Ordinance is not preempted under the Chamber's theory of *Garmon* preemption.

## CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of the Chamber's federal antitrust claims, and remand the federal antitrust claims to the district court for further proceedings.  We also affirm the district court's dismissal of the Chamber's NLRA preemption claims.

The parties shall bear their own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART, REMANDED.