08-4621-cv
Lafaro v. N.Y. Cardiothoracic Group, PLLC, et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

———————

August Term, 2008

(Argued: March 16, 2009                    Decided: July 1, 2009)

Docket No. 08-4621-cv

————————————————

ROCCO J. LAFARO, M.D., ARLEN G. FLEISHER, M.D., CARDIAC SURGERY GROUP,
P.C.,

*Plaintiffs-Appellants*,

– v. –

NEW YORK CARDIOTHORACIC GROUP, PLLC, STEVEN L. LANSMAN, M.D., DAVID
SPIELVOGEL, M.D., WESTCHESTER COUNTY HEALTH CARE CORPORATION,
WESTCHESTER MEDICAL CENTER,

*Defendants-Appellees*.

————————————————

Before: CALABRESI and WESLEY, *Circuit Judges*, and DRONEY, *District Judge*.[1]

Appeal from the September 11, 2008 decision and order of the United States District
Court for the Southern District of New York (Stephen C. Robinson, District Judge) dismissing,
based on state action immunity, antitrust suit brought by cardiothoracic surgeons with practice in

———————

[1]The Honorable Christopher F. Droney, United States District Court for the District of
Connecticut, sitting by designation.

public hospital in Valhalla, New York, against hospital, public benefit corporation, doctors and medical practice.

**Holding:** The Court of Appeals, Droney, District Judge, sitting by designation, held that remand was required to permit district court to determine whether public benefit corporation actively supervised defendant doctors' anticompetitive conduct.

VACATED and REMANDED.

RICHARD G. MENAKER, Menaker & Herrmann, New York, N.Y., *for Petitioners*.

JORDY RABINOWITZ, Senior Associates General Counsel, Westchester County Health Care Corporation, Office of Legal Affairs Executive Offices, Valhalla, N.Y., *for Respondents*.

DRONEY, *District Judge*:

## BACKGROUND

The defendant Westchester County Health Care Corporation ("WCHCC") is a public benefit corporation created by the state of New York in 1997 to perform the "essential public and governmental function" of operating the Westchester County Medical Center ("WMC"), a hospital in Valhalla, New York. *See* N.Y. Pub. Auth. Law §§ 3300 *et seq*. WCHCC's enabling statute endowed it with broad and comprehensive powers, as well as the flexibility to provide health and medical services for the public either directly or by agreement with other entities or individuals, and to determine its own internal policies, including those governing the practice of medicine within WMC. *Id.*

The defendants Steven L. Lansman, M.D., and David Spielvogel, M.D., are

2

cardiothoracic and transplant surgeons whose professional corporation is defendant New York Cardiothoracic Group ("NYCG") (collectively referred to hereinafter as the "private defendants"). In December 2004, the private defendants entered into an exclusive professional services agreement with WCHCC for the provision of cardiothoracic surgery services at WMC. Defendant Lansman is also the Director of the Department of Cardiothoracic Surgery at WMC.

Plaintiffs Rocco J. Lafaro, M.D., and Arlen G. Fleisher, M.D., are also cardiothoracic surgeons, whose professional services corporation is the Cardiac Surgery Group ("CSG"). Lafaro and Fleisher had cardiothoracic privileges at WMC prior to the effective date of WCHCC's contract with the private defendants. That contract includes a provision "grandfathering" Lafaro and Fleisher, that is, excepting them from the exclusivity granted to the private defendants.[2]

The plaintiffs allege in their complaint that WCHCC's grant of an exclusivity agreement to the private defendants violated the Sherman Act, 15 U.S.C. § 1, and state law. The factual allegations in the complaint include that Lansman, after the execution of the exclusivity agreement, directed the scheduling of access to operating rooms, assignment of staff, and

---

[2]The contract states that WMC "hereby engages [the private defendants] as an independent contractor to provide on an exclusive basis, except as provided otherwise herein with regard to Grandfathered Physicians, all Professional Services and Administrative Services in the Section [of Cardio-Thoracic Surgery of the Department of Surgery]"; it further states that the private defendants "shall provide such number of Physicians . . . who, when considered in combination with Grandfathered Physicians, shall be sufficient to fully provide to the satisfaction of the Hospital all of the Services required by the Hospital." A-72. In the section defining exceptions to the exclusivity provision, the contract states that "[NYCG's] right to be the exclusive provider of cardio-thoracic services at the Hospital . . . is subject to the following exceptions. During the term of this Agreement, (i) the surgeons listed below . . . ("Grandfathered Physicians") shall be entitled to provide cardio-thoracic surgery services and device implementation . . . ." A-89.

availability of equipment for heart and lung surgery at WMC to cause "maximum disadvantage" to the plaintiffs and their patients and to give preference to Lansman and Spielvogel, and that the private defendants blocked CSG's effort to hire a physician's assistant to provide operating room support. In a decision dated September 11, 2008, the district court granted the defendants' motion for judgment on the pleadings and dismissed the complaint for the reason that state action immunity applied to all defendants.

DISCUSSION

**A. Standard of Review**

The decision of the District Court granting the motion for judgment on the pleadings is reviewed *de novo*. *Pierce v. Underwood*, 487 U.S. 552, 558 (1988); *see also City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 392 (2nd Cir. 2008) (citing *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003), *DeMuria v. Hawkes*, 328 F.3d 704, 706 n.1 (2d Cir. 2003) (noting that the legal standards of review for motions to dismiss and motions for judgment on the pleadings "are indistinguishable")). "On a motion to dismiss or for judgment on the pleadings we 'must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.' " *Miller*, 321 F.3d at 300 (quoting *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)). We are not bound to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 1950.

Because the district court dismissed the case on the single basis of state action immunity,

4

our only task with regard to the plaintiffs' claims and the defendants' affirmative defenses[3] is to evaluate the district court's conclusion that all the defendants are immune from suit, based on the allegations in those pleadings.

**B. State Action Immunity**

*Parker v. Brown*, 317 U.S. 341 (1943), first established that action by a state acting in its sovereign capacity is not subject to federal antitrust law. However, a state subdivision such as a municipality or public corporation does not enjoy the complete deference due a state as sovereign. The state subdivision is entitled to state action immunity only when it acts pursuant to a "clearly articulated and affirmatively expressed" state policy that authorizes its actions. *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410-13 (1978); *see also Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38-40 (1985). The requisite showing of authority has two components: first, the subdivision must have "authority to regulate"; second, it must have "authority to suppress competition." *Elec. Inspectors, Inc. v. Village of E. Hills*, 320 F.3d 110, 118 (2d Cir. 2003) (quoting *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 372 (1991). So long as the subdivision's anticompetitive activities are a "foreseeable consequence" of the state delegation, the "clear articulation" standard has been met. *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1043 (2d Cir. 1986) (citing *Hallie*, 471 U.S. at 43).

State action immunity may also extend to private entities, when their particular

---

[3]The affirmative defenses contained in the defendants' first amended Answer include, *inter alia*, that the defendants' conduct does not lessen competition or create a monopoly.

anticompetitive acts are authorized by the State and further state regulatory policies. *Patrick v. Burget*, 486 U.S. 94, 99-100 (1988). The two-pronged test for extending state action immunity to a private party is commonly referred to as the "*Midcal* test," following its articulation in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97 (1980). In addition to a clearly articulated state policy, a private party seeking state action immunity under *Midcal* must show active supervision of its anticompetitive conduct by the state. *Cine 42nd St. Theater Corp.*, 790 F.2d at 1043 (citing *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 61-62). The requirement of active state supervision "is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Hallie*, 471 U.S. at 46. This requirement exists because absent supervision, "there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick*, 486 U.S. at 101. In *Midcal*, the Supreme Court stated that the active state supervision requirement was necessary

> to prevent a State from circumventing the Sherman Act's proscriptions 'by casting . . . a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.' 445 U.S. at 106, 100 S.Ct. at 943. Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.

*Hallie*, 471 U.S. at 46-7. Thus, the objective of the *Midcal* test's second prong is to ensure that the state itself, rather than a private party, is the effective decision maker. *Fed. Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992).

This Court stated that governmental entities which are immune from antitrust activity must be permitted to enter into contracts with private entities without suffering "tangential attacks" on their authorized, anticompetitive practices via suits against the private parties. *See*

6

*Cine 42nd St. Theater Corp.*, 790 F.2d at 1048, *Elec. Inspectors*, 320 F.3d at 125-26 (citing *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59 (2d Cir. 1998)). In both *Cine 42nd St. Theater Corp.* and *Wheelabrator*, active supervision was not required of the private entity because the only anticompetitive actions allegedly taken by the private-party defendants were those of contracting with the state-created entity. *Elec. Inspectors*, 320 F.3d at 125-26. We held that under those (limited) circumstances, "subjecting [the private-party defendants] to antitrust liability would effectively block the state entity's efforts to carry out its mandate through contracts with private parties." *Elec. Inspectors*, 320 F.3d at 125 (citing *Wheelabrator*) (original brackets omitted).

This case presents us with an opportunity to again recognize the immunity for private parties identified by *Hallie* and *Cine 42nd St. Theater Corp.*, but at the same time reaffirm the important purpose of *Midcal's* "active supervision" requirement, which is to ensure that the State itself, rather than a private party, is the effective decision maker. The latter requires that a governmental entity, if it wishes to extend antitrust immunity to the private parties with whom it contracts, must actively supervise decisions of these private parties in order to ensure that they further the interests of the State.

## C. Application

### 1. WCHCC and WMC

We agree with the district court that WCHCC is entitled to the same status, for purposes of the state action immunity analysis, as a municipality. *Cf. Cine 42nd St. Theater Corp.*, 790 F.2d at 1047. The district court also correctly concluded that the type of anticompetitive

7

behavior by WCHCC that is at issue in this case was a foreseeable consequence of the authorizations in WCHCC's enabling statute. WCHCC's enabling statute created WCHCC for the express purpose of operating a hospital in the public interest. N.Y. Pub. Auth. Law § 3301. This statute also granted WCHCC broad powers to ensure that it would have the "legal, financial and managerial flexibility to take full advantage of opportunities and challenges presented by the evolving health care environment," *id.* § 3301(4), "to enter into contracts . . . necessary or convenient or desirable for the purposes of the corporation," *id.* § 3305(11), "to provide health and medical services for the public directly or by agreement . . . with any person, firm or private or public corporation or association[,] . . . to make internal policies governing admissions and health and medical services," *id.* § 3306(2), and "to determine the conditions under which a physician may be extended the privilege of practicing within a health facility under the jurisdiction of the corporation." *Id.* § 3306(6). This statutory language indicates that the legislature clearly foresaw that WCHCC could be party to anticompetitive contractual arrangements with private parties. No "active state supervision" (by New York) is thus required as to WCHCC's own operations. Nor is a separate "active supervision" inquiry required as to WMC, the hospital run by WCHCC. It would not make sense to require a separate inquiry into WCHCC's active supervision of WMC when management of WMC, a public hospital, is the specific public purpose for which WCHCC was created and continues to exist under its enabling statute.

We also agree with the district court that New York's Health Care Reform Act ("HCRA"), 1996 N.Y. Laws Ch. 639, does not compel a different conclusion. WCHCC's enabling statute shows that the legislature foresaw that WCHCC would have the power and

flexibility to choose from a range of competitive and anticompetitive arrangements for best fulfilling its statutory purposes within an "evolving health care environment."[4]  Although the 1996 Act encouraged more competition in certain areas of health care, it dealt principally with changing the hospital inpatient reimbursement methodology.  It did not specifically override the grants of authority the legislature included in the WCHCC's enabling statute, nor did it de-authorize the type of action taken by WCHCC at issue in this case, nor make that action any less foreseeable.[5]

## 2.	Private Defendants

---

[4]For example, the enabling statute notes with respect to medical projects (which are defined as "any substantial durable apparatus, equipment, device or system . . . for the purpose of care, treatment, or diagnosis," N.Y. Pub. Auth. Law § 3303(10)(g)(4)) that

> It is the intent of the legislature that overall cost should in all cases be a major criterion in the selection of project developers for award of contracts . . . and that, wherever practical, such contracts should be entered into through competitive bidding procedures as prescribed by sections one hundred one and one hundred three of the general municipal law . . . . [I]n some instances it may be beneficial to the corporation to award a contract for a medical project on the basis of factors other than cost alone . . . .

N.Y. Pub. Auth. Law § 3303(9).  Although not directly applicable to the WCHCC's agreement with the private defendants and other providers of medical *services*, this provision illustrates that the enabling statute's various provisions contemplated arrangements resulting from competitive bidding as well as other less competitive arrangements.

[5]Because the district court has not yet determined whether WCHCC actively supervised the private defendants, we do not reach the question of whether WCHCC might derive liability from any unsupervised anticompetitive conduct on the part of the private defendants, a question we left unanswered in *Electrical Inspectors*.  If the district court determines on remand that the private defendants were not actively supervised and that antitrust violations have occurred, it may have occasion to consider whether state action immunity would allow a finding against WCHCC on this basis even though WCHCC's own actions were authorized by the state.  *Cf. Elec. Inspectors*, 320 F.3d at 129.

The private defendants argue that like WCHCC and WMC, they need not meet the "active supervision" prong of the *Midcal* test because they were operating pursuant to a contract with WCHCC. However, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . [or by] becoming a participant in a private agreement or combination by others for restraint of trade." *Parker*, 317 U.S. at 351-52. "[E]ven a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *La. Power & Light Co.*, 435 U.S. at 417. We have recognized that the state action doctrine "will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies." *Elec. Inspectors*, 320 F.3d at 124 (quoting *Patrick*, 486 U.S. at 100-01).

The complaint here alleges both (1) antitrust violations arising out of the mere existence of an exclusive contract between WCHCC and the private defendants (*see, e.g.*, Complaint at ¶ 55(a)), and (2) anticompetitive acts by the private defendants, separate from the existence of the contractual arrangement itself, that were not subject to review by the State, acting through the WCHCC (*see, e.g.*, Complaint at ¶ 55(b) and (c)).

First, the complaint challenges WCHCC's partial grant of exclusivity to the private defendants as itself an antitrust violation. *See, e.g.*, Complaint at ¶ 33 ("The Exclusive Agreement has had an adverse effect on competition in cardiothoracic surgery in a number of respects. It has eliminated the incentive for Lansman and Spielvogel to be price sensitive in their delivery of services."). Were this the only allegation in the complaint, allowing the case to proceed against the private defendants would ordinarily serve no purpose but to allow a

10

"tangential attack" on the operations of WCHCC. The complaint's additional allegations,[6] especially when read in light of the "grandfathering" provision of the contract between WCHCC and the private defendants (which explicitly protects the plaintiffs' right to provide cardio-thoracic surgery services at WMC), do not allege merely that a contract exists with WCHCC to supervise the cardiothoracic unit, and that the private defendants were acting pursuant to that contract. Rather, the complaint includes claims that the private defendants were violating the contract's provisions protecting the plaintiffs from anticompetitive behavior by the private defendants. The contract, though lacking in details as to the rights of the "grandfathered physicians," specifically provides that the plaintiffs "shall be entitled to provide cardio-thoracic surgery services and device implementation" at WMC. The contract did not authorize anticompetitive conduct for the sole purpose of improving the private defendants' personal financial and professional interests. Under these circumstances, requiring the private defendants to answer such an allegation by showing that they were actively supervised by WCHCC is required by *Midcal* and does not hamper the State's efforts to carry out its mandate "[t]o provide health and medical services for the public, . . . to make internal policies governing admissions and health and medical services," N.Y. Pub. Auth. Law § 3306(2), and "[t]o determine the

---

[6]An example of the alleged anticompetitive acts by the defendants is the allegation that Lansman used his position as Chief of the Section of Cardiothoracic Surgery to direct "that the scheduling of access to the operating rooms, assignment of staff, and availability of equipment for heart and lung surgery at WMC be handled in a manner that gives preference to him and Spielvogel and causes maximum disadvantage to plaintiffs and their patients . . . . Lansman and Spielvogel have introduced practices for their convenience and advantage that have adversely affected the quality of patient well-being and care." Complaint ¶ 36. The complaint's additional allegations distinguish this case from *Cine 42nd St. Theater Corp.* and *Wheelabrator*. In both those cases, the private parties were not accused of abusing their contracting status, but merely challenged for entering into the agreements.

11

conditions under which a physician may be extended the privilege of practicing within a health facility under the jurisdiction of the corporation." *Id.* § 3306(6). The allegations of misconduct by the private defendants are not a tangential attack on the authority of the governmental entity to enter into anticompetitive agreements, but rather on the authority of the private defendants to act beyond the scope of the agreement with WCHCC and/or the policy articulated by the legislature in WCHCC's enabling statute.

As we stated in *Electrical Inspectors*, the "active supervision" requirement of *Midcal* "seeks to prevent states from transforming the *Parker* doctrine, designed to accommodate the states' sovereign interest in regulating commerce, into an unbounded license for the states to issue Sherman Act exemptions to private parties." 320 F.3d at 124. Unless WCHCC maintains "ultimate control" over the partial monopoly it created, there is a real danger that the private defendants could act to further their own interests, rather than the governmental interests of the state. *Cf. Elec. Inspectors*, 320 F.3d at 127 (citing *Hallie*, 471 U.S. at 47). Although granting an exclusive contract to a private party is not itself a *per se* antitrust violation, a private party is not exempted from the "active supervision" prong of the *Midcal* test simply by virtue of purporting to act pursuant to a contract with a governmental entity that itself would be entitled to state action immunity. As we made clear in *Electrical Inspectors*, "[t]he suspension of the requirement for an independent immunity inquiry for the private parties . . . should be understood to apply only to their acts of contracting with an authorized government entity." 320 F.3d at 127. The private defendants must therefore show that they were actively supervised by WCHCC in order to share in its immunity.

We emphasize the limited nature of this holding, which merely reverses the district

12

court's grant of a motion for judgment on the pleadings, and is based only on the district court's failure to permit a factual inquiry as to the private defendants, including an evaluation of whether the private defendants met both prongs of the *Midcal* test. The private defendants have argued that a vehicle for active supervision was in place, via New York Public Health Law § 2801-b (*see* Appellee's Brief at 30 n.11); however, we note that whether or not this argument has merit, "[t]he mere potential for state supervision is not an adequate substitute for a decision by the State." *Ticor Title Ins.*, 504 U.S. at 638. Whether the private defendants were in fact actively supervised remains for the district court to determine in the first instance. We also, of course, do not conclude that the private defendants actually engaged in any anticompetitive behavior.

**CONCLUSION**

For these reasons, we VACATE the district court's order and REMAND the case to the district court for further proceedings consistent with this opinion.