In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1166
MICAH UETRICHT and JOHN KADERBEK,
 Plaintiffs-Appellants,
 v.

CHICAGO PARKING METERS, LLC,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 21 C 3364 — Matthew F. Kennelly, Judge.
 ____________________

 ARGUED SEPTEMBER 22, 2022 — DECIDED APRIL 7, 2023
 ____________________

 Before WOOD, HAMILTON, and ST. EVE, Circuit Judges.
 WOOD, Circuit Judge. Desperate to find untapped sources
of funds during the recession of 2008, the City of Chicago re-
alized that it would need to think outside the box. It faced a
$150 million shortfall in revenue, see Oﬃce of the Inspector
General of the City of Chicago, An Analysis of the Lease of the
City’s Parking Meters 13–14 (2009), available at
http://dig.abclocal.go.com/wls/documents/060209parking-
meter.pdf, and it emphatically did not want to bridge the gap
2 No. 22-1166

with a large and deeply unpopular tax increase. As it looked
around for an alternative way to find the necessary money, its
eyes fell on city-controlled metered street parking. Realizing
that this was an asset it could monetize, it ended up awarding
a 75-year Concession over designated parking spaces to the
private firm Chicago Parking Meters, LLC (“CPM”), which
agreed to give the City an upfront cash payment of more than
a billion dollars in exchange.
 After the City Council approved the new arrangement and
CPM took over, the price of parking in the areas covered by
the Concession shot upward, quickly more than doubling. Lit-
igation in both state court and federal court followed. Alt-
hough it is of no direct relevance to our case, we note that the
Illinois Appellate Court has upheld the arrangement. See In-
dep. Voters of Illinois Indep. Precinct Org. v. Ahmad, 2014 IL App
(1st) 123629. On the federal side, the plaintiﬀs now before us
filed an action against CPM both for themselves and on behalf
of a class. Describing themselves as two car drivers who live
in Chicago, they assert that CPM has violated the federal an-
titrust laws, as well as the Illinois Consumer Fraud and De-
ceptive Practices Act. See 15 U.S.C. §§ 1, 2; 815 ILCS 805. They
did not name the City as a codefendant. The district court
never ruled on the class allegations. Instead, it dismissed
plaintiﬀs’ antitrust theories for failure to state a claim, on the
ground that they were barred by the state-action immunity
doctrine of Parker v. Brown, 317 U.S. 341 (1943); it then relin-
quished jurisdiction over the supplemental state-law count.
 We aﬃrm. The Concession represents no more or less than
a use of municipal authority to substitute, during the term of
the lease, exclusive private operation for direct city operation
of specified areas of Chicago’s on-street parking facilities. Put
No. 22-1166 3

diﬀerently, it swaps one “monopolist” (the City) for another
(CPM). We’re not so sure, by the way, that there is anything
here that the antitrust laws would recognize as a monopoly.
The Illinois Secretary of State reports that there are more than
a million passenger vehicles in the City, see Active Registration
Counts – City of Chicago County, Ill. Sec’y of State (last visited
Mar. 3, 2023), https://www.ilsos.gov/departments/vehi-
cles/statistics/lpcountycounts/COUNTY103.PDF, and those
cars can be found in apartment building parking garages, pri-
vate residential garages, private lots, public lots, unregulated
streets, and, of course, metered parking. Nonetheless, for pre-
sent purposes we will assume that plaintiﬀs are correct and
that the metered spaces at issue fall into a distinct market that
has been monopolized. The critical point is that the City had
the necessary authority to enter into this arrangement. Our
independent review of the Concession Agreement (which is
attached to the complaint, see Fed. R. Civ. P. 10(c)) satisfies us
that the City has reserved meaningful powers to oversee and
regulate CPM’s performance. The deal itself might have been
foolish, short-sighted, or worse, and if one is to believe news
reports, it may have saddled Chicago with the most expensive
street parking in the country, see Tania Babich, Chicago parking
most expensive in U.S., ABC7 Chicago (July 12, 2017), but that
is not enough to state a claim for a violation of the antitrust
laws.
 I
 There is not much to add about the events underlying this
litigation. After the City decided to privatize certain on-street
metered parking through a long-term lease, it put out a re-
quest for bids. Ten applicants responded, of which eight were
deemed qualified. See An Analysis of the Lease of the Cityʹs
4 No. 22-1166

Parking Meters, supra, at 12 (2009). CPM was the winning bid-
der. It oﬀered to pay the City $1,156,500,000 in cash in ex-
change for the exclusive right to operate and collect revenue
from the City’s network of metered parking. This represented
approximately 36,000 parking spots located in business and
commercial areas. The term of the Agreement, as we said, is
75 years. Plaintiﬀs assert that just 14 years into that term, CPM
has already recouped its initial investment, and that it is now
looking forward to another 60 years or so of monopoly profits.
 On December 4, 2008, the City Council passed an ordi-
nance authorizing the Mayor and the Chief Financial Oﬃcer
to execute the Agreement. The ordinance stated that the Con-
cession was “in the best interest of the residents of the City
and desirable for the welfare of its government and aﬀairs.”
Chicago, IL, Authorization for Execution of Concession and
Lease Agreement and Amendment of Titles 2, 3, 9 and 10 of
Municipal Code of Chicago in Connection with Chicago Me-
tered Parking System (Dec. 14, 2008), available at
https://www.chicago.gov/content/dam/city/depts/rev/supp_i
nfo/ParkingMeter/MeteredParkingSystemOrdinance.pdf.
Plaintiﬀs do not challenge the process by which the
Agreement was adopted.
 Although the Agreement has been amended a couple of
times since it took eﬀect (most recently in 2013), the key pro-
visions have not changed. We review them briefly and rely on
them in our de novo assessment of the complaint. The Agree-
ment gives CPM “the right to operate, maintain and improve
the Metered Parking System, to retain the revenues to be de-
rived from the operation of the Concession Metered Parking
Spaces and to be compensated for the operation of Reserve
Metered Parking Spaces for the Term of the Agreement,
No. 22-1166 5

subject to the reserved police powers and regulatory powers
of the City with respect to the Metered Parking System … .”
 Note that there are two kinds of parking spaces covered
by the Agreement: the “Concession” spaces and the “Re-
serve” spaces. Those terms are defined (along with many
more) in Article I, section 1.1, of the Agreement. The two types
of spaces are described as follows:
 “Concession Metered Parking Spaces” means (i) those
 Metered Parking Spaces so designated by the City
 from time to time and included in the Metered Parking
 System operated and maintained by the Concession-
 aire pursuant to this Agreement, (ii) … the Metered
 Parking Spaces listed in Amended Schedule 10 and
 designated thereon as Concession Metered Parking
 Spaces, and (iii) … the Metered Parking Spaces located
 in the Parking Lots listed on Revised Schedule 10A.
 …
 “Reserve Metered Parking Spaces” means those Me-
 tered Parking Spaces so designated by the City that the
 Concessionaire operates and maintains on behalf of the
 City pursuant to this Agreement and with respect to
 which the City is paid the net Metered Parking Reve-
 nues.
CPM is entitled to all of the revenue generated by the Conces-
sion Spaces, while the City is entitled to 85% of the net reve-
nue attributable to the Reserve Spaces. CPM operates and
maintains both types of parking spaces. The City is entitled to
designate, add, and remove any kind of metered space, but if
the average daily number of Concession Spaces falls below
30,000 for a reporting year, the City must pay CPM an amount
6 No. 22-1166

equal to the reduction in the fair market value of CPM’s inter-
est in the Concession.
 Section 1.1 defines the City’s “Reserved Powers” as fol-
lows:
 [T]he exercise by the City of those police and regula-
 tory powers with respect to Metered Parking Spaces,
 including Concession Metered Parking Spaces and Re-
 serve Metered Parking Spaces, and the regulation of
 traﬃc, traﬃc control and the use of the public way in-
 cluding the exclusive and reserved rights of the City to
 (i) designate the number and location of Metered Park-
 ing Spaces and to add and remove Metered Parking
 Spaces; (ii) establish and revise from time to time the
 schedule of Metered Parking Fees for the use of Me-
 tered Parking Spaces; (iii) establish and revise from
 time to time the Periods of Operation and Periods of
 Stay of Metered Parking Spaces; (iv) establish a sched-
 ule of fines for parking violations; (v) administer a sys-
 tem for the adjudication and enforcement of parking
 violations and the collection of parking violation fines
 and (vi) establish and administer peak period pricing,
 congestion pricing or other similar plans.
See also Concession Agreement § 7.2. The City did not, how-
ever, have the right to take those steps without financial con-
sequences. The Agreement designates a number of “compen-
sation events” that trigger an obligation on the City’s part to
pay CPM. (The parties refer to these as “true-up payments.”)
The list includes a reduction in fees, a failure to adjust fees for
inflation, a reduction in the number of Concession Spaces, the
addition of competing public parking facilities within a cer-
tain distance, or broadly speaking any exercise of the City’s
No. 22-1166 7

reserved powers that “may have a material adverse eﬀect on
the fair market value of the Concessionaire Interest.” If the
City exercises its right to terminate the Agreement, it must
pay CPM for any loss in value that ensues. Plaintiﬀs assert
that these financial consequences are so draconian that they
mean, in eﬀect, that the City’s reserved powers are illusory.
 Insofar as plaintiﬀs are saying that there are robust protec-
tions in the Agreement designed to protect the deal CPM
struck, they are not wrong. Nonetheless, the record shows
that the City has exercised its reserved powers on several oc-
casions, and it has made the required payments to CPM. Me-
dia sources indicate that in 2016, the City added 752 metered
spaces in the central area during Mayor Emmanuel’s term,
and an article published in 2022 asserted that 1,800 parking
meters had been added since Mayor Lightfoot took oﬃce. See
John Byrne, 1,800 parking meters added since Chicago Mayor
Lightfoot took oﬃce, THE PANTAGRAPH (Aug. 15, 2022); Fran
Spielman, Emanuel adding 752 metered parking spaces in central
area, CHICAGO SUN TIMES (Nov. 4, 2016). More significantly,
from plaintiﬀs’ perspective, are the yearly true-up payments
that Chicago has made to CPM over the years. Based on pub-
licly filed audited financial statements, it appears that CPM
has recognized $151,660,810 in true-up revenue since 2009:
 YEAR PAYMENT
 2009 $533,330
 2010 $1,658,036
 2011 $14,134,842
 2012 $26,738,664
 2013 $14,617,084
8 No. 22-1166

 2014 $6,481,150
 2015 $8,637,891
 2016 $15,740,662
 2017 $21,736,219
 2018 $17,371,527
 2019 $11,037,684
 2020 $6,250,836
 2021 $6,722,885
These are not trivial amounts, and so we accept plaintiﬀs’ con-
tention that the City must think twice, or three times, before
it exercises reserved powers that give rise to compensation for
CPM.
 There is much more to the Agreement, which as amended
runs more than 230 pages, but most of it is not pertinent to
our case. The central issue is whether, as the district court be-
lieved, this arrangement is categorically outside the reach of
the federal antitrust laws because it represents state action, or
if it fails to satisfy the criteria for state-action immunity and
thus must be returned to the district court for further proceed-
ings. We begin by reviewing the state-action doctrine, espe-
cially as applied to actions taken by municipalities, and we
then examine its application to this Agreement.
 II
 At the time Congress passed the Sherman Act in 1890, the
Supreme Court had a narrow view of Congress’s power un-
der the Commerce Clause of Article I. “Commerce” did not
cover intrastate activity, such as manufacturing, see United
States v. E.C. Knight Co., 156 U.S. 1 (1895), and it did not
No. 22-1166 9

include purely internal transactions, see Gibbons v. Ogden, 22
U.S. 1 (1824). But as the Supreme Court’s understanding of
the scope of the commerce power expanded during the 1930s,
the substantive reach of the Sherman Act followed suit. By
1942, the Court had repudiated the narrow view of Congress’s
power to regulate interstate commerce reflected in E.C. Knight
and had adopted the position that anything aﬀecting inter-
state commerce was also “a proper subject of federal regula-
tion.” Wickard v. Filburn, 317 U.S. 111, 122 (1942). Two years
later, the Court confirmed that the Sherman Act has expanded
along with the Commerce Clause:
 We have been shown not one piece of reliable evidence
 that the Congress of 1890 intended to freeze the pro-
 scription of the Sherman Act within the mold of then
 current judicial decisions defining the commerce
 power. On the contrary, all the acceptable evidence
 points the other way. That Congress wanted to go to
 the utmost extent of its Constitutional power in re-
 straining trust and monopoly agreements … .
United States v. South-Eastern Underwriters Ass’n, 322 U.S. 533,
557 (1944) (addressing whether the Sherman Act reaches in-
terstate insurance transactions; later superseded by the
McCarran-Ferguson Act on the specific question whether con-
tracts of insurance fell within the Sherman Act).
 In the midst of these developments in the general scope of
the Sherman Act came a case posing questions of federalism:
Parker v. Brown. The state of California had adopted a market-
ing program for the 1940 raisin crop pursuant to a state law
designed to restrict competition and prop up the price of rai-
sins. The vast majority of California’s raisins—90 to 95 per-
cent—were shipped outside the state. All raisins were subject
10 No. 22-1166

to an elaborate allocation system, under which the producers
classified them, allocated 50 percent of the crop to a “stabili-
zation pool,” held back another 20 percent in a “surplus
pool,” and sold the remaining 30 percent. Violations of the
system were punished as misdemeanors.
 One grower, who wanted to sell more than the system
would permit, sued California’s Director of Agriculture and
other responsible oﬃcials. He asserted violations of the Sher-
man Act, the Agricultural Marketing Agreement Act of 1937,
and the Commerce Clause. He prevailed before a three-judge
court on his Commerce-Clause theory, but the Supreme Court
reversed. The part of the Court’s opinion of interest for our
purposes is its analysis of the “validity of the prorate program
under the Sherman Act.” Parker, 317 U.S. at 350. The Court be-
gan with two critical points:
 We may assume for present purposes that the Califor-
 nia prorate program would violate the Sherman Act if
 it were organized and made eﬀective solely by virtue
 of a contract, combination or conspiracy of private per-
 sons, individual or corporate. We may assume also,
 without deciding, that Congress could, in the exercise
 of its commerce power, prohibit a state from maintain-
 ing a stabilization program like the present because of
 its eﬀect on interstate commerce.
Id. The first assumption introduced the idea that state action
is not subject to the same rules as private action. The second
assumption accepted that Congress could, if it wished, over-
ride state legislation that is inconsistent with the Sherman Act.
The question before the Court was whether Congress had
done so.
No. 22-1166 11

 In reaching its ultimate conclusion, the Court relied in part
on the fact that the Sherman Act has nothing to say on the
question whether states fall within the definition of the “per-
sons” who are subject to the law. It found significance in this
silence, on the theory that such an important intrusion on the
states’ power to regulate their own economies would have
been addressed expressly. Looking to “the purpose, the sub-
ject matter, the context and the legislative history of the stat-
ute,” the Court was persuaded that the Sherman Act was not
intended to, and did not, reach state action. Id. at 351. It found
instead that “the state command to the Commission and to
the program committee of the California Prorate Act is not
rendered unlawful by the Sherman Act since, in view of the
latter’s words and history, it must be taken to be a prohibition
of individual and not state action.” Id. at 352. Such a restraint
was simply one “which the Sherman Act did not undertake to
prohibit.” Id. Indeed, given the contemporary understanding
of the Commerce Clause in 1890, and the fact that Congress
passed the Sherman Act pursuant to that power, it is possible
that the drafters would have thought that state laws limited
to intrastate matters were outside the scope of the Commerce
Clause, and for that reason alone were not preempted.
 The next important development in the state-action ex-
emption recognized by Parker came in California Retail Liquor
Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97 (1980).
Ever since Parker, it had been understood that a state could
not simply announce that the Sherman Act did not apply
within its borders, but it was not clear what a state needed to
do in order to obtain Parker protection for a local economic
program. In Midcal, a wine distributor brought an antitrust
challenge to California’s state-imposed system of resale price
maintenance and price posting for the wholesale wine trade.
12 No. 22-1166

The state court of appeal enjoined the pricing arrangement on
the ground that it violated the Sherman Act and was not enti-
tled to Parker immunity.
 The Supreme Court aﬃrmed. In so doing, it introduced a
two-part test for state-action immunity: “First, the challenged
restraint must be one clearly articulated and aﬃrmatively ex-
pressed as state policy; second, the policy must be actively su-
pervised by the State itself.” Midcal, 445 U.S. at 105 (quota-
tions omitted). Although the California system satisfied the
first of those criteria, it flunked the second one. It was not
enough, the Court held, for the state simply to authorize
price-fixing on the part of private parties and to enforce the
resulting prices. An express state policy substituting regula-
tion for competition was required instead, coupled with ac-
tive state supervision of the regulated party.
 The next question to arise related to the way in which
these principles apply if the “state” actor is a municipality, not
the state itself. In City of Lafayette v. Louisiana Power & Light Co.,
435 U.S. 389 (1978), and Community Communications Co. v. City
of Boulder, 455 U.S. 40 (1982), the Supreme Court held that mu-
nicipalities acting alone do not qualify as the requisite source
of state law. Lafayette involved a municipal corporation acting
pursuant to general powers delegated by the state legislature,
while Community Communications presented the case of a city
with broad home-rule powers under state law. In either in-
stance, the Court held, only if the local action “constitutes the
action of the State [ ] itself in its sovereign capacity … or unless
it constitutes municipal action in furtherance or implementa-
tion of clearly articulated and aﬃrmatively expressed state
policy” is Parker immunity available. Community Communica-
tions, 455 U.S. at 52.
No. 22-1166 13

 It soon turned out that municipalities, while not the same
as states, are also not the equivalent of private actors for Parker
purposes. In Town of Hallie v. City of Eau Claire, 471 U.S. 34
(1985), the question was how to apply the Midcal test—clear
articulation and aﬃrmative expression at the state-law level,
coupled with active supervision—to municipalities. The
Town of Hallie, Wisconsin, and three other small towns, lay
just outside the borders of the City of Eau Claire. They sued
the City under the antitrust laws, claiming that it was monop-
olizing the provision of sewage treatment services and unlaw-
fully tying those services to the related activities of sewage
collection and transportation. The district court dismissed the
complaint, and this court aﬃrmed. We held that Wisconsin
law adequately conferred the right on the City either to fur-
nish or to refuse to furnish the sewage services. The active-
supervision element, however, did not follow the Midcal
script. We reasoned that active state supervision over the mu-
nicipality’s actions “would erode traditional concepts of local
autonomy and home rule.” Town of Hallie, 471 U.S. at 38. This
led us to conclude that active supervision is not necessary if
the state regulatory scheme relies on a municipality.
 The Supreme Court aﬃrmed. It regarded this as a question
of first impression—one that had been unnecessary to explore
in Lafayette and Community Communications. Its ruling was un-
ambiguous: “We now conclude that the active state supervi-
sion requirement should not be imposed in cases in which the
actor is a municipality.” Id. at 46. In so doing, it explained that
the active-supervision requirement plays only an evidentiary
role: it oﬀers a way to ensure that the actor is actually engag-
ing in the conduct at issue pursuant to state policy. Id. It went
on to explain that
14 No. 22-1166

 [w]here the actor is a municipality, there is little or no
 danger that it is involved in a private price-fixing ar-
 rangement. The only real danger is that it will seek to
 further purely parochial public interests at the expense
 of more overriding state goals. This danger is minimal,
 however, because of the requirement that the munici-
 pality act pursuant to a clearly articulated state policy.
 Once it is clear that state authorization exists, there is
 no need to require the State to supervise actively the
 municipality’s execution of what is a properly dele-
 gated function.
Id. at 47.
 The last case in this line that deserves a quick look is Fed-
eral Trade Commission v. Phoebe Putney Health System, Inc., 568
U.S. 216 (2013). There, the Court had to decide “whether a
Georgia law that creates special-purpose public entities called
hospital authorities and gives those entities general corporate
powers, including the power to acquire hospitals, clearly ar-
ticulates and aﬃrmatively expresses a state policy to permit
acquisitions that substantially lessen competition.” Phoebe
Putney, 568 U.S. at 219. The Court found that the Georgia law
did not adequately state such a policy, and so it held that the
state-action immunity from the antitrust laws (in that case, the
Clayton Act § 7) did not apply. It emphasized that it “recog-
nize[d] state-action immunity only when it is clear that the
challenged anticompetitive conduct is undertaken pursuant
to a regulatory scheme that is the State’s own.” Id. at 225 (quo-
tations omitted). Nothing indicated that the State of Georgia
“aﬃrmatively contemplated that the hospital authorities
would displace competition by consolidating hospital owner-
ship,” id., and so the first part of the Midcal test was not
No. 22-1166 15

satisfied. The Court had no occasion to consider the question
of active supervision.
 III
 This brief review reveals that there are several issues be-
fore us. First, we address the question whether the City would
be entitled to state-action immunity if it had been the party
sued by the plaintiﬀs. Second, we consider whether plaintiﬀs’
decision to sue Chicago’s lessee, CPM, makes any diﬀerence
to the outcome. Third, we look at plaintiﬀs’ argument that the
City has retained such minimal control over CPM’s operation
of the Metered Parking System that the link between any state
action and private action has been broken in a way that de-
prives CPM of the right to take advantage of the state-action
shield. Finally, we touch on plaintiﬀs’ complaint about the
duration of the Agreement.
 A
 As our review of the Parker doctrine as applied to munici-
palities indicates, the first question is whether the action at is-
sue—the 75-year Concession—rested on clearly articulated
and aﬃrmatively expressed state policy. Even though Chi-
cago is a home-rule city, see About City Government & the Chi-
cago City Council, Oﬃce of the City Clerk, City of Chicago (last
visited Mar. 9, 2023), https://www.chicityclerk.com/about-
city-government-chicago-city-council, we know from
Community Communications that the regulation in question
must come directly from the State of Illinois, not the City.
 Several Illinois laws, taken together, provide the authority
for the state’s municipalities to regulate parking. (We note
that the state need not compel the allegedly anticompetitive
activity; it is enough for the state policy expressly to permit
16 No. 22-1166

the conduct. See So. Motor Carriers Rate Conference v. United
States, 471 U.S. 48, 61–62 (1985).) We begin with a simple law,
65 ILCS 5/11-80-2, which states that “[t]he corporate authori-
ties of each municipality may regulate the use of the streets
and other municipal property.” The Metered Parking Spaces
addressed by the Agreement are all on Chicago streets or
other municipal property. Under this statute, the City has the
power to dictate how those streets may be used—for parking,
for loading zones, for bus lanes, and so forth. Similarly, Illi-
nois law gives the City the authority to regulate the use of
sidewalks, 65 ILCS 5/11-80-13, to the extent the sidewalks are
relevant to street parking.
 Most importantly, the City has broad authority to regulate
parking pursuant to 65 ILCS 5/11-71-1. That statute appears
under the heading “Oﬀ-Street Parking,” but its language is
not so limited. See Michigan Ave. Nat’l Bank v. County of Cook,
191 Ill.2d 493, 505–06 (2000) (“When the legislature enacts an
oﬃcial title or heading to accompany a statutory provision,
that title or heading is considered only as a short-hand refer-
ence to the general subject matter involved in that statutory
section, and cannot limit the plain meaning of the text.”) (quo-
tations omitted). Subpart (a) provides as follows in relevant
part:
 Any municipality is hereby authorized to:
 (a) Acquire by purchase or otherwise, own, construct,
 equip, manage, control, erect, improve, extend, main-
 tain and operate motor vehicle parking lot or lots, gar-
 age or garages constructed on, above and/or below
 ground level, public oﬀ-street parking facilities for mo-
 tor vehicles, parking meters, and any other revenue pro-
 ducing facilities, hereafter referred to as parking
No. 22-1166 17

 facilities, necessary or incidental to the regulation, con-
 trol and parking of motor vehicles, as the corporate au-
 thorities may from time to time find the necessity
 therefor exists, and for that purpose may acquire prop-
 erty of any and every kind or description, whether real,
 personal or mixed, by gift, purchase or otherwise.
65 ILCS 11-71-1(a) (emphases added). Nothing in this lan-
guage indicates that the parking meters must be located in an
oﬀ-street lot or garage. The meters are simply one device for
producing revenue and controlling the parking of motor ve-
hicles.
 Subpart (b) of the same statute confirms the City’s author-
ity to “[m]aintain, improve, extend and operate any such
parking facilities and charge for the use thereof.” Id.
§ 11-71-1(b). Finally, subpart (c) states that municipalities may
“[e]nter into contracts dealing in any manner with the objects
and purposes of this [part of the Municipal Code], including
the leasing of space on, or in connection with, parking meters
for advertising purposes.” Id. § 11-71-1(c).
 But leases may exist for more than advertising purposes.
Lest there be any doubt about the ability of the City to dele-
gate its power to own and operate parking spaces to another
entity, two more statutes answer any final questions. The first
is 65 ILCS 5/11-71-8, which provides as follows:
 The corporate authorities of any such municipality
 availing of the provisions of this [part of the Illinois
 Municipal Code] are hereby given the authority to
 lease all or any part of any such parking facilities, and
 to fix and collect the rentals therefor, and to fix, charge
 and collect rentals, fees and charges to be paid for the
18 No. 22-1166

 use of the whole or any part of any such parking facil-
 ities, and to make contracts for the operation and man-
 agement of the same, and to provide for the use, man-
 agement and operation of such lots through lease or by
 its own employees, or otherwise.
The only limitation on this authority is the requirement,
spelled out in the statute, for a competitive bidding process
and segregation of funds for leases with a term greater than
one year. As noted earlier, the City did follow the prescribed
procedures, and that aspect of the Concession is not at issue
here.
 Lastly, Illinois has a statute expressly directed at the Parker
state-action exemption from the antitrust laws: 65 ILCS
5/1-1-10. It states broadly that it is the policy of the state that
all powers granted to municipalities “may be exercised …
notwithstanding eﬀects on competition.” Id. Included in the
laws singled out by this statute is article 11 of the Illinois Mu-
nicipal Code, which addresses corporate powers and func-
tions of municipalities, including the parking rules. Id.
§ 1-1-10(b) (“ … all of Divisions of Articles 10 and 11 of the
Illinois Municipal Code … .”). Although the state obviously
cannot obtain Parker protection simply by declaring that its
system meets the Supreme Court’s criteria for immunity, the
state may take whatever steps it wishes to clarify that it is
“clearly articulating and aﬃrmatively expressing” its inten-
tion to regulate a certain area.
 Plaintiﬀs argue that these laws do no more than the provi-
sions of Georgia law regarding hospital acquisitions at issue
in Phoebe Putney. As we noted, the Court there held that laws
authorizing a special-purpose entity called a hospital author-
ity to “acquire by purchase, lease, or otherwise” other
No. 22-1166 19

hospitals or medical facilities did not express any intent to
displace competition in the market with state regulation.
Phoebe Putney, 568 U.S. at 224, 227. But that is because it is easy
to contemplate acquisitions or other property transfers that
have no anticompetitive eﬀect, and so there is nothing about
that power that inevitably leads to anticompetitive outcomes.
Moreover, nothing in the Georgia laws purported to confer
exclusive ownership over the area’s hospitals on the authori-
ties. Thus, the fact pattern before the Court was not one in
which “the displacement of competition was the inherent,
logical, or ordinary result of the exercise of authority dele-
gated by the state legislature.” Id. at 229.
 Chicago’s metered parking places stand in an entirely dif-
ferent position. The City does not share the authority to regu-
late the use of the streets with anyone. See 65 ILCS 5/11-80-2.
It thus may decide what to do with the streets: keep them
open, carve out bike or bus lanes, establish zones exclusively
for area residents, or provide metered parking. Illinois law
gives the City a monopoly, to use plaintiﬀs’ word, over those
spaces. And plaintiﬀs seem to concede that if they had sued
Chicago under the antitrust laws for its part in the Conces-
sion, they would have failed. The Illinois statutes we have dis-
cussed represent an aﬃrmative decision at the state level to
replace competition with regulation. There is no market in
street parking places, and so there is no competition to be pre-
served.
 B
 Our reasoning does not change simply because plaintiﬀs
named CPM rather than the City as the defendant. The Su-
preme Court held as much in Southern Motor Carriers, when it
said that “[t]he success of an antitrust action should depend
20 No. 22-1166

upon the activity challenged rather than the identity of the
defendant.” 471 U.S. at 58–59 (citation omitted). The Court
specifically disapproved drawing any distinction between a
case against a state agency and one against a private party as
a named defendant. Id. at 58. Illinois law permits the City to
exercise its powers through a lessee, and that is what Chicago
has done. Or at least that is what Chicago says it has done.
Plaintiﬀs counter that Chicago gave away so much authority
in the Agreement that CPM is no longer acting under munic-
ipal supervision, and so it has lost the right to rely on Parker
immunity. We now address that argument.
 C
 This issue—active supervision in the context of municipal
regulation—did not arise in Phoebe Putney. We know from
Town of Hallie that municipalities are not subject to the active
supervision requirement. 471 U.S. at 45, 47. But that does not
mean that anything goes when the state confers this kind of
power on a municipality. The arrangement will be protected
by Hallie if and only if the entity exercising the delegated state
power is in fact the municipality itself. (Naturally, the munic-
ipality must do this through some kind of agent—employees,
independent contractors, lessees, or the like.). If the munici-
pality is only the nominal market regulator while a private
entity actually exercises the power conferred by state law,
Hallie immunity is not available. That follows from the Su-
preme Court’s recognition that “where a private party is en-
gaging in anticompetitive activity, there is a real danger that
he is acting to further his own interests, rather than the gov-
ernmental interests of the State.” N. Carolina Bd. of Dental Ex-
aminers v. FTC, 574 U.S. 494, 507 (2015) (quotation omitted). In
other words, window dressing will not do.
No. 22-1166 21

 FTC v. Ticor Title Insurance Co., 504 U.S. 621 (1992), exem-
plifies this limit on state-action immunity. The Supreme Court
examined whether title insurance companies in four states
(Connecticut, Wisconsin, Arizona, and Montana) were enti-
tled to state-action immunity in connection with the fixing of
rates for search and examination services. Id. at 628. In each
state, “the title insurance rating bureau was licensed by the
State and authorized to establish joint rates for its members.”
Id. at 629. But the states used a “negative option” to approve
those rate filings. They allowed rates that were established
through agreements among private companies (that is, pri-
vate price-fixing) to become eﬀective if the state took no action
within a specified time. The Court found that this system,
which was used in Wisconsin and Montana, flunked the test
for “active supervision” for Parker purposes. It held that
“[a]ctual state involvement, not deference to private pricefix-
ing arrangements under the general auspices of state law, is
the precondition for immunity from federal law.” Id. at 633.
 With this in mind, we must ascertain whether the City is
the entity determining the way the Metered Parking System
will be operated, or if instead it ceded its authority to CPM, a
private party, leaving CPM with the unfettered ability to pur-
sue its own private ends. If the City is the true operator of the
system, acting through CPM as an agent subject to City regu-
lation and control, then the prerequisites for Hallie treatment
exist. On the other hand, if, as in Ticor, the City gives away
meaningful regulatory power to a private actor, then we do
not have a case of municipal action, and Parker immunity will
fail. As the Sixth Circuit put it, “the basic question in antitrust
cases that involve municipal and private actors is whether the
municipality or the private party made the eﬀective decision
that resulted in the challenged anticompetitive conduct.”
22 No. 22-1166

Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527,
537–38 (6th Cir. 2002). It explained how this relates to the
Midcal analysis as follows:
 If the municipality or a municipal agent was the eﬀec-
 tive decision maker, then the private actor is entitled to
 state action immunity, regardless of state supervision.
 If the private actor was the eﬀective decision maker,
 due to corruption of the decision-making process or
 delegation of decision-making authority, then it is not
 immune, unless it can show that it was actively super-
 vised by the state.
Id. at 538; see also Chamber of Commerce of the United States v.
City of Seattle, 890 F.3d 769, 788–89 (9th Cir. 2018) (Hallie
framework not available in “a scenario in which the City au-
thorizes collective price-fixing by private parties” who exer-
cise discretion that is “far from trivial”); LaFaro v. New York
Cardiothoracic Group, PLLC, 570 F.3d 471, 477, 480 (2d Cir.
2009) (entity that is equivalent to a municipality must “main-
tain[] ‘ultimate control’ over the partial monopoly it created”
in order for private parties to a contract to share in state action
immunity).
 The Ninth Circuit faced a similar problem in Chamber of
Commerce of the United States v. City of Seattle. The court was
asked to decide whether a Seattle ordinance authorizing
rideshare drivers collectively to fix the prices for their services
was immune from the antitrust laws. The district court dis-
missed a suit by the Chamber of Commerce and others that
asserted that the ordinance violated federal antitrust and la-
bor laws. In so doing, it relied on Parker immunity, and it held
that the labor laws did not preempt the local ordinance. On
appeal, the Ninth Circuit reversed the antitrust ruling. It held
No. 22-1166 23

that Seattle’s ordinance did not rest on a state policy clearly
articulating and aﬃrmatively authorizing private parties to
fix the prices for ride-referral services. Chamber of Commerce,
890 F.3d at 783, 787.
 Although that would have been enough to dispose of the
case, the court went on to address the active-supervision re-
quirement imposed by Midcal, as modified by Town of Hallie
for municipalities. Seattle’s involvement, it reasoned, was too
attenuated to qualify for the Hallie rule. As the court put it,
“where, as here, state or municipal regulation by a private
party is involved, active state supervision must be shown,
even where a clearly articulated state policy exists.” Id. at 788
(cleaned up) (emphasis added). It adopted this gloss on the
Hallie rule in light of the concern that private parties—as op-
posed to municipalities—are likely to be motivated by self-
interest, not the public interest. Significant delegation of reg-
ulatory powers to private parties carries with it the risk of
abuse of market power, in the form of price-fixing, monopo-
listic pricing, or output restriction. The active supervision re-
quirement, by requiring the state or municipality to bear final
regulatory responsibility, assures that whatever impairment
of competition occurs is done as a matter of conscious state
policy.
 It follows that if the municipality eﬀectively regulates the
monopoly and the private party is not free to pursue its own
self-interest, the action qualifies as that of the municipality it-
self: it is the municipality, not the private actor, that is per-
forming the functions delegated to it by state law. The policies
and rules that are needed to further the relevant policy are in
the control of the municipality.
24 No. 22-1166

 Plaintiﬀs contend that their complaint portrays an ar-
rangement under which the City of Chicago has entirely
ceded its regulatory authority to the private entity CPM—that
the City is nothing but CPM’s puppet. If that were true, then
just as in the Seattle case, the defendants would not qualify
for state-action immunity, and we would need to reverse for
further proceedings. But, as we now outline, our independent
review of the Agreement satisfies us that Chicago has the
power to regulate CPM’s administration of the Metered Park-
ing Spaces covered by the Concession.
 The Agreement was itself an act of the City, pursuant to its
powers to lease parking spaces and its authority to use a long-
term instrument for that purpose. As required, the City in-
vited private parties to bid; it indicated that it would not ac-
cept any bid under $1 billion; and it received bids from eight
qualified entities. It negotiated the terms of the Concession
with CPM, the winning bidder, and the City Council issued
an ordinance approving the Agreement. See An Analysis of
the Lease of the Cityʹs Parking Meters, supra, at 13–14. In
short, the City chose to regulate by contract rather than by or-
dinance.
 The Agreement is replete with provisions under which the
City has reserved its police and regulatory powers. They in-
clude the following:
  Add or remove metered parking spaces, whether
 they are Concession Spaces or Reserve Spaces
  Collect revenue from newly added Reserve Spaces
  Set meter hours of operation and periods of stay
  Establish and revise parking fees
No. 22-1166 25

  Set all standards and policies applicable to the me-
 tered parking system
  Close streets for any reason
  Set amounts of fines for metered-parking viola-
 tions; administer the adjudication system; and keep
 fine revenues
 Although, as noted earlier, the City must compensate
CPM for exercises of regulatory power that undermine the ba-
sis of the bargain, the Agreement has an internal mechanism
that allows the City to mitigate the economic eﬀects of the
true-up payments. Specifically, it is entitled to add Reserve
Spaces and collect 85% of the revenue they generate, and it
can raise parking fees. The resulting revenue can be, and has
been, used to support the true-up payments.
 The breadth of the City’s regulatory powers sets this case
apart from Ticor. As noted, the Ticor Court deemed the state’s
“negative option” scheme insuﬃcient for state involvement
because the key question is “whether the State has exercised
suﬃcient independent judgment and control so that the de-
tails of the rates or prices have been established as a product
of deliberate state intervention, not simply by agreement
among private parties.” 504 U.S. at 634–35. The Agreement
here shows that the key actor is the City. Take meter rates for
example, the focal point of plaintiﬀs’ grievances. At the incep-
tion of the bidding process, the City gave “the qualified bid-
ders a Confidential Information Memorandum … that among
other things set out a proposed schedule of meter rate in-
creases that would be enacted as part of the lease. This meter
rate schedule is nearly identical to the meter rates that were
eventually approved by the City Council.” An Analysis of the
26 No. 22-1166

Lease of the Cityʹs Parking Meters, supra, at 13–14. Critically,
the City retained “the Reserved Power to establish and revise
from time to time the Metered Parking Fees.” Agreement §
7.1. Unlike the situation in Ticor, then, the City has the sole
power to set the rates on its own initiative without regard to
CPM.
 Plaintiﬀs insist that these powers are essentially toothless
because the financial impact of their exercise deters the City
from using them. (They speak of the City’s “paralysis” and
the “impossibility” of meaningful regulation.) But, as the Illi-
nois Appellate Court also recognized, “the City has, in fact,
exercised its regulatory powers for the benefit of the public
notwithstanding the Concession Agreement’s compensation
provisions.” Independent Voters, 2014 IL App (1st) 123629 ¶ 81.
For instance, the City increased the parking fees in 2020
through approval of that year’s Revenue Ordinance. Parking
Meter Rate Increase, City of Chicago (Feb. 24, 2021), available
at https://311.chicago.gov/s/article/Parking-Meter-Rate-In-
crease?language=en_US.
 The fact that the City pays a price for certain actions can-
not be enough to undermine the whole Concession. No one
would have wanted to sign an agreement that the City could
gut the next day by (for example) cutting in half the number
of covered parking spaces and trying at the same time to keep
the full up-front payment. Regulation is possible even if the
City must conduct a cost-benefit analysis before it takes a
given step. If we were to accept plaintiﬀs’ argument, we
would essentially be making Parker immunity depend on
whether the City increases or decreases its revenues over the
lifespan of the Agreement. We cannot have a situation in
which the antitrust laws are not violated if the City has
No. 22-1166 27

enough money to compensate CPM and decides to lower the
metered rates, but they are violated if the City decides that the
cost of compensation is too high and so refrains from taking a
certain step.
 We are satisfied that meaningful regulation exists under
the Agreement and thus that nothing more in the way of ac-
tive state supervision is necessary for Parker immunity. We
conclude with a few words about one more argument plain-
tiﬀs raise.
 D
 Plaintiﬀs are disturbed about the fact that the Agreement
will run for 75 years, and that, as they calculate things, CPM
has already recouped all of its start-up costs and stands to
reap billions in “monopoly” profits for the next 60 years or so.
But, aside from the fact that the Illinois Appellate Court has
already found the 75-year term to be legal, see Independent
Voters, 2014 IL App (1st) 123629, it is worth pointing out that
there is nothing unique or suspicious about a long-term con-
tract. Exclusive contracts for a long duration with private par-
ties are nothing new in Chicago. Examples include water sup-
ply contracts authorized for a period not exceeding 101 years,
65 ILCS 5/11-135.5-25, and certain real estate leases that are
permitted for a period not to exceed 99 years, 65 ILCS 5/11-
135-6. They are permissible, so long as the City retains mean-
ingful regulatory authority.
 ***
 It is easy to overlook the fact that the City derives benefits
from these agreements, just as it pays a price. Although the
metered parking spaces may be very expensive, the City also
has a company that is maintaining them, upgrading them to
28 No. 22-1166

take advantage of cellphone and other technology, and han-
dling payments. Parker immunity does not turn on whether,
on balance, this was a good or a bad deal. All that matters is
that it was one that was authorized by state law and that re-
mains under the regulatory power of the City. We agree with
the district court that state-action immunity applies here, and
so we AFFIRM its judgment.